**FLORIDA POWER & LIGHT CO., et al., Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 96–644C.

United States Court of Federal Claims.

June 28, 2001.

Alexander D. Tomaszczuk, McLean, VA, for plaintiffs. John H. O'Neill, Jr., Michael G. Lepre, and Daniel S. Herzfeld, Shaw Pittman, Washington, DC, of counsel.

James G. Bruen, Jr., Washington, DC, with whom was Acting Assistant Attorney General Stuart E. Schiffer, for defendant. Matthew J. Troy, Department of Justice, and Marc E. Kasischke, Department of Energy, of counsel.

## OPINION

MILLER, Judge.

This case is before the court after trial and presents a claim by utility companies that the Government breached a contract to provide enrichment services by improperly including various costs in the price charged for such services.

## FACTS

Florida Power & Light Company, Consolidated Edison Company of New York, Inc., Empresa Nacional del Uranio, S.A., IES Utilities, Inc., Niagara Mohawk Power Corporation, Pennsylvania Power and Light Company, and Wisconsin Electric Power Company, as well as the later-added Virginia Electric and Power Company and Duke Energy Corporation ("plaintiffs"), are utility companies that produce nuclear power, which requires an enriched form of uranium for fuel. The United States Government assists in this endeavor by providing "enrichment services." These enrichment services are aimed at converting mined uranium into enriched uranium suitable for use in plaintiffs' nuclear reactors. The contracts that plaintiffs entered into with the United States, through the Department of Energy ("DOE"), detailed how the enrichment services were to be provided and how DOE would bill plaintiffs for these services. These contracts, referred to collectively as the Utility Services Contract (the "USC"), are the subject of the instant dispute.

A short history of DOE's provision of enrichment services is necessary to understand the background of this case. John R. Longenecker was the Deputy Assistant Secretary for Uranium Enrichment in the Office of Nuclear Energy from 1983 to 1987 and testified for plaintiffs on the state of the uranium enrichment services in the early 1980s.

The status of the enrichment services business in 1983 was, according to Mr. Longenecker, grim. The United States' market share for sales outside the United States had fallen from 100% in the 1970s to approximately 35%. The United States previously had enjoyed total market dominance because of its monopoly on enrichment services, but this situation changed in the 1980s, when two European suppliers came into operation and took a large portion of the European market. As a consequence, the United States found itself in the position of being the world's highest-priced supplier of enrichment services. The United States, moreover, had built its business plan around a forecasted future demand for enrichment services that never materialized. Another aspect of the United States' enrichment services business plan—a relic of the 1970s monopoly era—was a lack of fixed prices. The United States' contracts in effect before 1983 charged customers the price for enrichment in effect at the time of delivery, so the price would be announced at the beginning of each fiscal year. Competitors offered a more stable pricing plan. These combined factors resulted in an impaired ability for the United

States to compete for and supply enrichment services.

This dire situation was an important issue within DOE in 1983. Because DOE was the only domestic supplier of enriched uranium and because the military relied heavily on DOE for provision of nuclear fuel for the Navy's submarines and aircraft carriers, Secretary of Energy Donald Hodel formed a special review team to determine options and the future path of the enrichment services business. Ultimately, Mr. Longenecker's task was to coordinate development of a competitive strategy.

In January 1984 DOE announced its competitive strategy for recovery of the enrichment services business. DOE's plan was to determine future demand, lower the costs of meeting that demand, and then stabilize its business for the long term. Central to this plan was a new contract for DOE's enrichment customers.

The USC was signed, in substantially the same form, by all nine utility plaintiffs. The USC set forth the provision of enrichment services and the charges for such services. Importantly, the USC stated that "[t]he charges to be paid to DOE for enrichment services provided to the Customer ... will be determined in accordance with the established DOE pricing policy for such services." "Established DOE pricing policy" is defined by the USC as "any policy established by DOE that is applicable to prices or charges in effect at the time of performance of any services under this contract." A 1979 Federal Register notice elucidated the established DOE pricing policy, as follows: "DOE's charges for enriching services will be established on a basis that will assure the recovery of appropriate government costs projected over a reasonable period of time." Uranium Enrichment Services; [sic] Criteria, 44 Fed. Reg. 28,875, 28,876 (May 17, 1979). This pricing policy was reaffirmed in July 1986, when DOE published an update that stated: "DOE will establish charges for enrichment services on a basis that recovers appropriate Government costs over a reasonable period

of time." Uranium Enrichment Services Criteria, 51 Fed.Reg. 27,144, 27,145 (July 29, 1986) (codified as 10 C.F.R. § 762.5 (1988)). The Atomic Energy Act, 42 U.S.C. § 2201(v) (1988), echoed this requirement, specifying that "any prices established under this subsection shall be on a basis of recovery of the Government's costs over a reasonable period of time."

How DOE implemented these criteria forms the basis of the instant dispute. Specifically, plaintiffs argue that a legislative change mandated a concurrent change in the price DOE charged for enrichment services. This legislative change was embodied in the Energy Policy Act of 1992, *see* 42 U.S.C. § 2297g–1(c) (1994) ("EPACT").

EPACT made significant changes in the Government's enrichment services program. Officially enacted on July 1, 1993, it established the United States Enrichment Corporation (the "USEC") to undertake the enrichment services previously performed by DOE. Additionally, EPACT established a Uranium Enrichment Decontamination and Decommissioning Fund ("D & D Fund"). *See* 42 U.S.C. § 2297g(a). That fund was created to pay "[t]he costs of all decontamination and decommissioning activities of [DOE]," 42 U.S.C. § 2297g–2(b), and "[t]he annual cost of remedial action." 42 U.S.C. § 2297g–2(c).[1]

The D & D Fund thus is collected to pay for D & D and remedial action and is funded in part by a special assessment collected annually from domestic utilities that purchased enrichment services from DOE between 1945 and October 23, 1992. The first assessment, for FY 1993, was invoiced in September 1993.

Although EPACT was enacted on October 24, 1992, the USEC did not assume responsibility for the administration of the enrichment services contracts until July 1, 1993. It is during this "transition period" that plaintiffs allege they were overcharged. In their July 14, 1995 claims submitted pursuant to the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (1994 & Supp. V 1999) (the

---

1. The exact definitions of D & D and remedial action are issues of fact which are discussed *infra* sections 1.1 and 1.2.

"CDA"), plaintiffs[2] assert that DOE "charged its enrichment customers … a FY 1993 price that included costs for D & D and Remedial Costs. This was improper because, as of FY 1993, these were no longer costs of the [enrichment activity]."

Contracting Officer Joe W. Parks rejected the original seven plaintiffs' claims on October 13, 1995. Thereafter, the utilities filed suit in the United States Court of Federal Claims, and defendant filed a motion for judgment on the pleadings arguing that the plaintiffs' action was barred by *res judicata* and *stare decisis*. Defendant contended that the claims in this case arose from the same transactions as the claims asserted in *Barsebäck Kraft AB v. United States*, 121 F.3d 1475 (Fed.Cir.1997), and *Centerior Service Co. v. United States*, No. 95–103C (Fed.Cl. Dec. 17, 1997) (unpubl.), which dealt with challenges to enrichment pricing after the transition period, and should have been included in those actions. In fact, the contracting officer had issued his decision in the instant case after the *Barsebäck* and *Centerior* actions were filed, but before they were decided. According to defendant, the utilities had not complied with the CDA because they should have supplemented their complaints in the *Barsebäck* and *Centerior* actions after receiving a contracting officer's decision in this case. The instant action was foreclosed by those decisions, in defendant's view, and *res judicata* therefore barred plaintiffs from appealing this action in the Court of Federal Claims. The trial court agreed and dismissed the action. *Florida Power & Light Co. v. United States*, 41 Fed. Cl. 477, 495 (1998).

The Federal Circuit reversed, ruling that the *Barsebäck* and *Centerior* causes of action were entirely separate from the causes of action in this case and that *res judicata* was

not a bar. The Federal Circuit noted that these earlier decisions addressed alleged violations of the established DOE pricing policy in the enrichment price that the USEC charged after (not during) the transition period. The Federal Circuit also held that issues remained which had not been foreclosed by *Barsebäck, Centerior,* or *Yankee Atomic Electric Co. v. United States*, 112 F.3d 1569 (Fed.Cir.1997).[3] The Federal Circuit issued the following mandate:

> Although the utilities pleaded this case broadly, the only remaining legal issue in this case is whether DOE breached the pricing provision of the enrichment services contracts by charging for decontamination and decommissioning costs that were defrayed out of the D & D Fund in violation of DOE's established pricing policy. To determine whether that theory is viable will require resolution of several legal and factual questions: (1) whether DOE had a cost-based pricing policy during the transition period between [October 24, 1992],[4] and June 30, 1993; (2) whether any purported costs that were included in DOE's contract price during that period were actually being defrayed from the D & D Fund; and (3) whether the inclusion of any purported costs that were being defrayed from the D & D Fund violated the utilities' contracts by violating the "established DOE pricing policy" for enrichment services applicable under Article IV of the contracts. Those questions are not amenable to resolution on the pleadings. We therefore remand to the trial court to resolve those questions and any others that the court may determine are pertinent to the utilities' contract-based claim.

*Florida Power & Light Co. v. United States,* 198 F.3d 1358, 1362–63 (Fed.Cir.1999).

---

**2.** Only seven of the nine plaintiffs submitted claims to the contracting officer on July 14, 1995. Duke Energy Corporation and Virginia Electric and Power Company filed substantially identical claims on August 17, 2000.

**3.** *Yankee Atomic* dealt with whether establishing the D & D Fund itself was a lawful exercise of government power. The Federal Circuit held that the Government's establishment of the D & D Fund was a sovereign act that was not pre-

cluded by any earlier enrichment services contracts. *Yankee Atomic,* 112 F.3d at 1581.

**4.** The Federal Circuit refers to the beginning of the transition period as September 1, 1992. The parties agree that the transition period began after the passage of EPACT on October 23, 1992. It is this agreed-upon time period that will be used in the court's analysis.

After remand and completion of discovery, plaintiffs filed an August 9, 2000 status report announcing that "while the evidence developed during discovery casts some doubt about whether D & D *qua* D & D was included in DOE's FY 1993 price calculations, there is compelling evidence which establishes that DOE's cost recovery calculations nonetheless allocated to the utilities approximately $1.5 billion in Environmental Restoration Costs which were not *bona fide* costs of the Uranium Enrichment Activity." Pls.' Status Rpt. filed Aug. 9, 2000, at 5. Plaintiffs also accused DOE of setting the price for enrichment services at the ceiling price specified in the USC in order to maximize revenues. Plaintiffs requested a trial date to resolve the questions posed by the Federal Circuit's remand.

On September 29, 2000, the case was transferred to this judge for trial. On November 17, 2000, the court entered an order setting trial for April 23, 2001. Thereafter, defendant filed a motion for summary judgment, and plaintiffs in response asserted, for the first time, 1) that the Government breached the contracts' implied duty of good faith and fair dealing and 2) that DOE improperly included two other cost components—imputed interest on the Gas Centrifuge Enrichment Project (the "GCEP") and costs relating to High Assay Uranium.[5] *See* Pls.' Br. filed Feb. 26, 2001, at 28, 32. Defendant objected to these late-introduced claims and argued that summary judgment should enter for defendant on the legal issues presented by the Federal Circuit. This court's March 22, 2001 order denied defendant's motion without prejudice, noting that defendant could renew its objection to any late-introduced claims at trial and make any necessary showing of prejudice.

At trial plaintiffs called six witnesses in support of their case: Mr. Longenecker, who testified about DOE's enrichment and pricing activities during the years 1983 to 1987; Claude A. Vellard, Manager of Nuclear Fuel for Florida Power & Light ("FPL"), who testified about DOE's promotion of the USC, FPL's understanding with respect to price when it entered into the USC and FPL's payments to the D & D Fund; Michael Howard Schwartz a consultant for Energy Resources International, Inc., who provided expert testimony on the technical aspects of uranium enrichment, on uranium enrichment pricing,[6] and on the D & D Fund itself; Howard Huie, General Engineer, DOE, an adverse witness who testified regarding his involvement in calculating and setting enrichment services prices from FY 1985 to FY 1993; Eugene C. Schmitt, Acting Deputy Assistant Secretary for Planning, Policy and Budget, DOE, an adverse witness who supervised Mr. Huie in setting enrichment services prices and testified about the financial background of setting those prices; and Avram Seth Tucker, who provided expert[7] testimony concerning how DOE set prices and the amount of plaintiffs' damages.

Defendant called two witnesses: Judy Fullner, Financial Specialist, Office of Business Operations, DOE, who testified about the accounting procedures and pricing policy of DOE and Mr. Schmitt, who testified further about the late-introduced GCEP and High Assay claims and about DOE's pricing criteria. Mr. Schwartz testified for plaintiffs on rebuttal.

Although the court considered the testimony of all witnesses, reference is made only to those whose testimony was deemed essential to support or explain a given finding.

## DISCUSSION

### 1. *Pricing policy*

█ Both parties introduced evidence on how DOE calculated the prices charged for enrichment services from 1984 through 1993.

---

**5.** The details of these late-introduced claims are explained more fully *infra* at sections 1.3, 1.4, and 1.5.

**6.** Although Mr. Schwartz was not qualified as an expert in the Government's pricing model, he was allowed to testify as a lay witness based on his understanding of the documentary evidence.

**7.** Mr. Tucker was qualified as an expert in accounting, in the cost and pricing of government contracts, and in damages. Mr. Tucker was not qualified as an expert in the application of DOE's pricing criteria.

The price charged under the USC was termed the "base price" and was expressed in a dollar amount per Separative Work Unit ("SWU"). A SWU is the unit of measurement of uranium enrichment services. For FY 1993 the base price was $125/SWU. The USC also specified a ceiling price that could be charged. In FY 1993 the ceiling was $125.34.

The first issue presented by the Federal Circuit's remand is whether DOE had a cost-based pricing policy during the transition period between October 24, 1992, and June 30, 1993. To answer this question, the court considers the regulations and statutes promulgated by DOE, the proofs at trial, and defendant's admissions.

The Federal Register, the Atomic Energy Act, and the Code of Federal Regulations all contain similar language advocating recovery of government costs over a reasonable period of time. Most pertinent to this discussion is 10 C.F.R. § 762.5: "DOE will establish charges for enrichment services on a basis that recovers appropriate Government costs over a reasonable period of time." Defendant admitted that "DOE used a cost-recovery methodology in determining the FY 1993 SWU Price." Def.'s Amended Ans. filed Oct. 20, 1997, ¶ 12. The Uranium Enrichment Activity (the "UEA") was the specific department within DOE that had responsibility for setting prices under the USC. Under the heading "Pricing Policy," DOE's 1992 UEA Financial Statement explained: "The pricing policy is to recover the Government's costs." Thus, the court finds that DOE did have a cost-based pricing policy during the transition period.

Before answering the next two questions posed by the Federal Circuit (whether any purported costs that were included in DOE's contract price during that period actually were being defrayed from the D & D Fund and whether such inclusion violated the "established DOE pricing policy" for enrichment services), the court first discusses the four cost categories challenged by plaintiffs. Because these categories were introduced at different times during the litigation and each involves unique factual circumstances, no uni-fied analytical approach to liability can be applied.

### 1) *Remedial action costs*

■ The term "remedial action costs" is defined rather lengthily in EPACT at 42 U.S.C. § 9601(24). Mr. Schwartz testified that remedial action "deals with clean up of various spills of chemical and radiological hazards in the environment." Under EPACT remedial action costs are required to be paid out of the D & D Fund to which the utilities contributed. 42 U.S.C. § 2297g–2(c). If the fund falls short, the Government is obligated to make up the difference. *Id.* Plaintiffs contend that remedial action costs were included in the price that was charged during FY 1993 and that doing so was improper. In essence, plaintiffs maintain that they were "double-billed" for remedial action costs: once when they paid into the D & D Fund and then again when a component for remedial action was included in the FY 1993 enrichment services price. Plaintiffs' August 9, 2000 status report sets forth this claim distinctly.

Plaintiffs' argument has some force. The October 13, 1995 letter from Contracting Officer Parks (the "Parks Letter") denying plaintiffs' claim plainly states that remedial action costs were included in the FY 1993 price. $754.7 million was included for "remedial and response action costs from FY 1988 and FY 1991," and $245.3 million was forecasted for "future remedial action accrual." The Parks Letter goes on to state that the remedial action costs will exceed the amounts available in the D & D Fund. The letter concludes that remedial action and D & D costs properly were included in the cost-recovery analysis because "these costs were part of the Government's cost of doing business."

This argument was repeated in substantially the same form at trial, when defendant's counsel stated that "[p]laintiffs were not overcharged.... Instead, EPACT and the transition to USEC stranded significant losses ... with no further customers to charge them to." Transcript of Proceedings, *Florida Power & Light v. United States*, No.

96–644C, at 1,304 ("Tr.").[8] In other words, because costs and losses to DOE were associated with enrichment services, the categories and types of those losses should not be distinguished. DOE's statutory mandate, defendant explains, was "recovery of the Government's costs." Tr. at 1,301. Given this mandate, defendant surmises that the improper inclusion of remedial action costs is irrelevant. So long as there were unrecovered costs, argues defendant, DOE could continue to charge plaintiffs for those costs.

This argument goes too far. In the first instance, the statutory mandate was not simply recovery of any and all of the Government's costs. 10 C.F.R. § 762.5 mandated that charges were to be calculated "on a basis that recovers appropriate Government costs over a reasonable period of time." The Atomic Energy Act similarly mandated prices set "on a basis of recovery of the Government's costs over a reasonable period of time." 42 U.S.C. § 2201(v). What constitutes "Government costs" is central to this court's inquiry and it is precisely this question that defendant's argument attempts to eclipse.

Remedial action costs were not appropriate "Government costs" for FY 1993. EPACT requires that remedial action costs be paid out of the D & D Fund. 42 U.S.C. § 2297g–2(c). "To the extent the amount in the Fund is insufficient, [DOE] shall be responsible for the cost of remedial action." *Id.* The explicit language of EPACT is sufficient to undermine defendant's argument that any government costs can be charged indiscriminately to the utilities without regard to their derivation. Under EPACT plaintiffs were required to pay for remedial action costs by paying into the D & D Fund and thus should not have been charged for these costs in the FY 1993 price.

Defendant's next argument points up the unique timing and factual circumstances of this case. The FY 1993 price was set in May of 1992. The fiscal year 1993 began on October 1, 1992. EPACT was signed into law on October 24, 1992. The utilities continued to pay the FY 1993 price to DOE until July 1, 1993, when the USEC assumed responsibility for administering the USC. Because the FY 1993 price was set before the passage of EPACT, defendant argues that DOE was not required to "redo its May 1992 cost recovery analysis or . . . to reset its [FY] 1993 price." Tr. at 1,295. Defendant instead insists that the "normal course of administering this program" would have been to reflect a change in costs in the "following fiscal year." Tr. at 1,295–96.

This argument would be convincing were it not for the striking reality that there was no "following fiscal year." On July 1, 1993, the USEC would begin administering the USC and thus the UEA would not have the opportunity to make any retro-adjustment for improperly charging plaintiffs for remedial action costs. More importantly, the UEA previously had made adjustments to its financial statements when changes in policy were announced. The notes to the FY 1993 financial statements state that because the UEA was no longer responsible for D & D costs, "the previously accrued liability of $589 million for future D & D costs was reversed in the FY 1992 financial statements." The court does not hold that an agency must undertake continually to reaudit its daily contractual expenditures in order to ensure compliance with legislative changes. However, in the factual circumstances presented by this case, DOE was obligated to follow established DOE pricing policy and correct an overcharge, if there was one.

Defendant's final argument against the improper inclusion of remedial action costs brings the court directly to the fourth issue posed by the Federal Circuit. The court has found that DOE did have a cost-based pricing policy and the evidence at trial demonstrated that certain costs which should have been defrayed from the D & D Fund (in this instance, remedial action costs) were charged to plaintiffs in the FY 1993 price. The only remaining inquiry is whether this action violated the "established DOE pricing policy." Defendant asserts that even assuming, *arguendo*, DOE realized that remedial action costs should not be included in the FY 1993

---

8. Statements of counsel that do not appear in the filings are quoted to the transcript of trial.

pricing, "it would have had options other than reducing [the] base price under the contract. The mere fact . . . that your costs go down doesn't mean that you reduce price necessarily." Tr. at 1,296. Defendant posits that DOE could have made adjustments in its analysis that could have resulted in the same base price, even with certain cost elements removed. It was DOE's flexibility in pricing, defendant argues, that would have allowed DOE to remove remedial action costs, change its price model, and still arrive at the same FY 1993 price.[9]

This argument is unavailing. The mandate of the Atomic Energy Act clearly required prices set "on a basis of recovery of the Government's costs over a reasonable period of time." To set prices without regard to government costs would violate "established DOE pricing policy." DOE did have flexibility in setting prices, but that flexibility did not authorize DOE to modify its cost-recovery model so that cost components themselves became an irrelevant or unimportant factor in setting prices. With the passage of EPACT certain government costs were simply removed from DOE's recovery strategy. To sanction an approach that allows DOE to take the position, with the full benefit of hindsight, that a substitute hypothetical analysis could have resulted in the same contract price anyway does violence to the established DOE pricing policy. Defendant cannot play a shell game with cost recovery.[10] The court holds that inclusion of government costs that should have been defrayed from the D & D Fund violated "established DOE pricing policy."

### 2) Depleted uranium disposal

■ For each year that it set prices, DOE prepared an annual Financial Report of the Enrichment Enterprise ("FREE") cost-recovery analysis to assess whether it could demonstrate recovery of government costs over a reasonable period of time. DOE input present and future costs associated with the enrichment activity and projected future base prices over a ten year cost-recovery period.[11] Using this projection, DOE would attempt to arrive at a yearly base price that would show full recovery of the Government's costs at the end of the cost-recovery period.

In its FY 1993 price calculation, DOE included $40 million in costs accrued for disposing of depleted uranium in FY 1991. The FREE model also included projected future costs of $40 million for each year between 1992 and 2003. Thus, in calculating the FY 1993 price, DOE included $520 million for disposal of depleted uranium.

Plaintiffs once again claim that they were "double-billed" because disposal of depleted uranium was to be paid out of the D & D Fund. Defendant disagrees, arguing that disposal of depleted uranium is not a D & D activity.[12]

This issue ultimately turns on the meaning of the categories to which these costs were assigned. The Energy Policy Act defines decontamination and decommissioning as

those activities, other than response actions or corrective actions, undertaken to decontaminate and decommission inactive uranium enrichment facilities that have residual radioactive or mixed radioactive and hazardous chemical contamination, including depleted tailings.

42 U.S.C. § 2297(6).

The D & D Fund was established to pay for decontamination and decommissioning, 42

---

9. For example, at trial defendant proffered that DOE could have shortened the cost-recovery period or lowered the projected prices for future sales. *See* Tr. at 1,296.

10. The court's holding that DOE was required to make a mid-stream adjustment to its pricing model applies to this case alone. In the peculiar circumstances of this case, removal of remedial action costs coincided almost with the first day of FY 1993. The fact that no later fiscal year was available during which DOE could account for these removed costs is also unusual. Moreover, DOE's cost-based pricing policy differs substan-

tially from that of the USEC's and is integral to the court's decision.

11. Later the cost-recovery period was extended to twelve years.

12. Defendant also raises the same objections with respect to remedial action costs, *e.g.*, because not all costs were recovered, DOE was not required to lower its price, and so forth. Having addressed those arguments, the court focuses on the remaining issue associated with disposal of depleted uranium.

U.S.C. § 2297g–2(b), as well as for remedial action costs, 42 U.S.C. § 2297g–2(c). Plaintiffs maintain that disposal of depleted uranium is a decontamination and decommissioning activity that should have been covered by the D & D Fund.

The definition of decontamination and decommissioning found in the EPACT includes a reference to "depleted tailings," although "depleted tailings" is not itself defined. Mr. Schmitt, who was the lead witness defending DOE's pricing policy, testified persuasively that he understood EPACT to "establish[ ] the D & D Fund," and that "the D & D Fund was authorized to make payments for D & D remediation and depleted uranium." The FREE model itself listed the yearly $40 million accruals for depleted uranium disposal in a column titled "(Non–Cash) D & D." Given this evidence, plaintiffs present a compelling case that the disposition of depleted uranium was, in fact, a D & D activity that should have been paid for by the D & D Fund.

Defendant's response to this evidence is tautological. It asserts that because EPACT did not define "depleted tailings," DOE was not under any obligation to remove those costs. The Parks Letter characterizes disposal of depleted uranium as "a separate activity not considered part of D & D." The Parks Letter explains that the "(Non–Cash) D & D" label in the FREE calculation was left over from an earlier calculation and that "the computer programmers" neglected to rename that column.

Mere argument by counsel (or, in this case, the decision issued by the contracting officer) is insufficient to rebut the facts developed at trial. *Wilner Construction Co. v. United States,* 24 F.3d 1397, 1401 (Fed.Cir.1994) (holding that contracting officer's decision is reviewed *de novo*). The court finds that disposal of depleted uranium is a D & D activity and should have been paid for out of the D & D Fund. Thus, as explained above, charging for a cost item that should have been defrayed from the D & D Fund violated "established DOE pricing policy."

### 3) *Imputed interest on GCEP*

■ The next cost category that plaintiffs claim as improperly included in the calcula-

tion of the FY 1993 price is $773 million in imputed interest. In the 1986 financial statements for the UEA, DOE announced that "[g]as centrifuge technology was discontinued as a uranium enrichment effort as of June 5, 1985 . . . ." DOE wrote off the $3.6 billion that had been invested in the GCEP. However, the imputed interest on that amount was left in calculations for each following fiscal year price, including FY 1993. Mr. Tucker, plaintiffs' expert in cost and pricing of government contracts, testified that retaining interest while writing off a capital loss was not accepted accounting procedure. The impressiveness of this expert's analysis was its own undoing in the face of a protest by defendant that the claim was introduced too late for counsel to be expected to rebut it. Defense counsel was ill-prepared to confront this testimony of plaintiffs' expert, without adequate time to prepare.

On August 9, 2000, plaintiffs filed a status report representing that "discovery has been completed" and requesting a trial date. Pls.' Status Rept. filed Aug. 9, 2000, at 1. This report identified the "approximately $1 billion in accrued amounts for Remedial Action costs, and $480 million in annual operating expenses for Depleted Uranium Disposal" discussed above. *Id.* at 5. On September 1, 2000, plaintiffs wrote to defendant's prior counsel stating that "[p]laintiffs' experts do not have any new conclusions, opinions or assumptions to report in this proceeding." On November 17, 2000, the court entered an order setting trial for April 23, 2001. On January 31, 2001, defendant filed a motion for summary judgment. On that same date, plaintiffs furnished to defendant a new report prepared by Mr. Tucker, which referred to imputed interest on GCEP and High Assay Costs. Mr. Tucker was deposed by defendant's counsel on February 1, 2001, and February 14, 2001. Plaintiffs' opposition to summary judgment filed on February 26, 2001, raised, for the first time, three new theories of recovery: imputed interest on GCEP, costs relating to High Assay Uranium, and a breach of the implied covenant of good faith and fair dealing. Defendant's reply, filed on March 8, 2001, protested emphatically that these late-introduced claims should be disal-

lowed. During argument on defendant's motion, the court noted that it appeared that the late-introduced claims had not been included in the complaint, nor were they presented to the contracting officer. The March 22, 2001 order denying defendant's motion allowed plaintiffs to include the new theories in the trial, so that the complete factual circumstances surrounding plaintiffs' claims could be put on the record. *See Florida Power & Light Co. v. United States,* No. 96–644C, ¶ 1 (Fed.Cl. Mar. 22, 2001) (order denying defendant's motion "without prejudice to renewal after trial on the ground of prejudice in trial preparation.").

During closing argument, defense counsel stated that, with respect to imputed interest, he "probably would have retained an expert to see whether they would contest Mr. Tucker's opinions." Tr. at 1,279. Had the imputed interest issue been raised earlier, "I would have tried to see if there were people [at DOE] who had deeper knowledge about this back in '85." Tr. at 1,280. Counsel maintained that prior to Mr. Tucker's deposition, "[i]mputed interest is not something that ... had registered one on a scale of a thousand in my mind." Tr. at 1,278. It is abundantly clear that, with respect to the imputed interest issue, defendant was prejudiced by the late introduction of that claim. Mr. Tucker's report containing plaintiffs' first reference to imputed interest was furnished 24 hours before Mr. Tucker's deposition. The imputed interest claim itself was not presented to this court until more than six months after plaintiffs represented that discovery was complete and five month after plaintiffs wrote to defendant's counsel stating that "[p]laintiffs' experts do not have any new conclusions, opinions or assumptions to report in this proceeding." The claim, totaling more than three-quarters of a billion dollars, was introduced less than two months before trial and increased the monetary amount plaintiffs sought by 50%. The court holds that defendant's prejudice was not purged at trial, despite defense counsel's able examination of Mr. Tucker, and plaintiffs therefore are foreclosed from recovering

based on the allegedly improper inclusion of imputed interest in the FY 1993 price.[13]

### 4) *High Assay Costs*

■ Plaintiffs assert that a final component of costs were included improperly in the price charged for enrichment services in FY 1993. High Assay Uranium is a type of uranium that is primarily used by the United States Government, while Low Assay Uranium is used by both the Government and commercial customers. The process used to create High Assay Uranium is more efficient than that used for Low Assay Uranium and also requires additional safeguards, security, and environmental protection costs. Because DOE determined that the Government, principally the military, was the primary user of High Assay Uranium, beginning in FY 1986, DOE transferred the costs of High Assay production costs to government users. Plaintiffs contend that some of these costs remained, however, and that they were improperly included in the FY 1993 price.

As an initial matter, the analysis used by plaintiffs' expert to derive the High Assay Costs appeared to the court to require a modest amount of mathematical sleight-of-hand. One exhibit, labeled Schedule K–6A, was the product of a tortured derivation which culminated in Mr. Tucker's conclusion that $394 million in High Assay Uranium production costs had been included improperly. The court notes that Mr. Tucker's analysis, in general, was highly detailed and extremely complex, but was especially nuanced with respect to the High Assay Uranium issue.

For many of the same reasons that plaintiffs are barred from recovery on the improper inclusion of GCEP interest, the court finds that plaintiffs cannot recover for allegedly improper High Assay Costs. This claim was outlined in an expert report presented to defendant one day before that expert's deposition. It was introduced into the record two months before trial, and only then in response to defendant's motion for summary

---

13. Defendant also questioned the court's jurisdiction on this and other late-introduced claims, as

discussed *infra* sections 2.1 and 2.2.

judgment. Defendant's counsel stated that he considered "what [he] did to come to an understanding of the financial statements and what was in them to be a yeoman's job." Tr. at 1,278. This was especially true because many of these financial statements were more than a decade old. On the short notice that was provided, defendant's counsel could not possibly be prepared to challenge the deductive analysis used by Mr. Tucker in developing an amount that represented High Assay Costs.

More importantly, Financial Specialist Fullner testified credibly that the $394 million amount did not represent High Assay Costs, but rather referred to assets that remained as part of the High Assay operation in general. Ms. Fullner was able to point to documentary evidence that supported this assertion. Plaintiffs' expert presented an opinion derived from financial records in the abstract, but Ms. Fullner was able to provide context that made her explanation of these costs plausible as part of DOE's overall objective of recovering costs over a reasonable period of time.

### 5) *Breach of implied covenant of good faith and fair dealing*

Plaintiffs' February 26, 2001 opposition brief on summary judgment charged that DOE's pricing under the USC breached the implied covenant of good faith and fair dealing.[14]

Mr. Longenecker, after establishing that the enrichment services business was "grim" in 1983 and that the United States wanted to re-establish itself as a stable provider of enrichment services, went on to describe the measures taken by DOE to recruit utilities to the USC. Mr. Longenecker recounted the efforts of then-Secretary of Energy Hodel at getting various utility customers to sign the USC. DOE held seminars around the world and tried to dispel the skepticism among the utilities about DOE's ability to be competitive. DOE's emphasis was on the concern

that the USC was a long-term contract (approximately 30 years), yet still did not contain fixed prices. During these seminars Mr. Longenecker was a presenter and stated that "[DOE] committed that as we reduced the costs, we would reduce the prices . . . ." Utility customers were also shown a graph illustrating DOE's expected declining future prices under the USC.

█ Secretary Hodel personally met with and telephoned the utility CEOs to urge them to accept the contract. Letters from Secretary Hodel detailed DOE's strategy to become a competitive supplier of enrichment services. According to Mr. Longenecker, Secretary Hodel was involved with overseeing the drafting of the USC itself. Secretary Hodel made "major changes" to the "whereas" clauses of the USC and required DOE "include a clear statement of DOE's intent on being competitive," as Mr. Longenecker put it. At Secretary Hodel's behest, the following clause was inserted:

> WHEREAS, DOE intends to serve as a reliable long-term supplier of uranium enrichment services at predictable prices while providing the most competitive prices possible through technological innovation.

Plaintiffs insist that the "whereas" clause listed created a contractual obligation to set low prices. This argument can be disposed of summarily: " '[W]hereas' clauses generally are not considered 'contractual' and cannot be permitted to control the express provisions of the contract . . . ." *KMS Fusion, Inc. v. United States,* 36 Fed.Cl. 68, 77 (1996); *Barsebäck,* 121 F.3d at 1481 (holding that "whereas" clauses cannot render contractual language ambiguous).

Plaintiffs acknowledge that during the early years of the USC, prices did decline. In 1985 the base price was $135.00/SWU. By 1988 the base price was down to $117.00/SWU. In 1990, however, the price rose to $117.85/SWU,[15] and by 1993, the price was

---

**14.** The court addresses the implications of the late introduction of this claim in the following section.

**15.** Given the amount of SWU purchased each year by the utilities, even a slight increase in the

base price could have a substantial effect. For example, during the approximate nine-month transition period at issue here, the utilities purchased more than 700,000 SWU.

$125.00/SWU. Plaintiffs attribute this increase to a desire to "harvest" as much revenue as possible under the USC before the USEC took over administration of the USC. This, according to plaintiffs, evaded the "spirit of the bargain," Pls.' Br. filed Feb. 26, 2001, at 33, and breached the implied covenant of good faith and fair dealing in the USC.

■ Every contract carries with it an implied obligation on both parties to conduct themselves reasonably and not to interfere with the performance of the other party. *Petrofsky v. United States*, 222 Ct.Cl. 450, 455, 616 F.2d 494, 497 (1980); *see also Orange Cove Irrigation Dist. v. United States*, 28 Fed.Cl. 790, 800 (1993) ("When one party has the authority to exercise discretion to determine an essential term of a contract ... the covenant of good faith and fair dealing requires that the exercise of that discretion be reasonable."). Plaintiffs charge that DOE's conduct both before and after the USC was signed breached the implied covenant of good faith and fair dealing.

■ Mr. Schmitt, who had authority to set prices during the 1990s, stated that he did not feel that he was bound by DOE's statements to customers on price and believed that the contract permitted DOE to charge the ceiling price. From the table provided in the parties' joint stipulation, this appears to be exactly DOE's policy during the early 1990s:

| Fiscal Year | Base Price (Per SWU) | Ceiling Price (Per SWU) |
|---|---|---|
| 1990 | $117.85 | ° $117.85 |
| 1991 | $117.85 | $120.72 |
| 1992 | $121.50 | $121.79 |
| 1993 | $125.00 | $125.34 |

Plaintiffs contend that the motivation for this pricing was to "harvest" revenue before the transition of enrichment services to the USEC. A report entitled "United States Uranium Enrichment Enterprise, An Independent Financial Assessment prepared for the Department of Energy," generated by Smith Barney, Harris Upham & Co., provided DOE with recommendations for pricing strategies.

It stated: "Our recommended pricing strategy is to harvest, that is, that the [DOE] should charge at the ceiling price to customers for as long as they remain under the USEC." However, Mr. Schmitt had a simple explanation for the prices that he set: "My ... interest in pricing was to recover the Government's costs and so I wanted to charge the ceiling price to recover the Government's costs." Mr. Schmitt pointed out that it was difficult to show recovery of government costs, even when charging the ceiling price under the contract. This testimony demonstrates that a "cost-recovery" strategy was employed, rather than a "harvest" strategy. Mr. Schmitt was a straightforward and candid witness, and the court has no doubt about his credibility, especially given that he was as candid an adverse witness as a proponent for defendant. Plaintiffs' counsel agreed with this assessment, stating "Mr. Schmitt was perfectly honest about everything he said." Tr. at 1,252.

The court finds that Mr. Schmitt, who, with the assistance of staff, was responsible for carrying out DOE's obligations under the USC, did so reasonably and did not breach the implied covenant of good faith and fair dealing. While some evidence did suggest that others at DOE were concerned with maximizing revenue before and during the transition to the USEC, Mr. Schmitt's explanation as to why he set those prices is valid and supported by the documentary evidence. His exercise of discretion in setting prices was reasonable; moreover, deviating from the course he pursued would have violated the Atomic Energy Act's mandate for cost recovery over a reasonable period of time.[16]

2. *Jurisdiction over claims for imputed interest, High Assay Uranium, and breach of implied covenant of good faith and fair dealing*

Plaintiffs were not the only litigants who interjected late claims at trial. After more than four years of litigation, including an appeal during which the issue did not surface, defendant had a jurisdictional epiphany. Defendant argued in an April 13, 2001 Mo-

---

16. Mr. Schmitt noted that, in fact, he wanted to offer more "attractive prices" so that he could project more sales in the future, thus enabling DOE to demonstrate cost recovery sooner.

tion *in Limine* that jurisdiction was lacking over the Imputed Interest, High Assay and good faith and fair dealing claims under both the CDA, and the Tucker Act, 28 U.S.C. § 1491(a)(1994 & Supp. V 1999). Defendant also argued that CDA jurisdiction was lacking over the remedial action and depleted uranium costs claims.[17]

### 1) *The CDA*

■ In order for the Court of Federal Claims to have jurisdiction under the CDA, a government contractor must present a valid claim to the contracting officer, and the contracting officer must issue a final decision on the claim. *See James M. Ellett Constr. Co. v. United States*, 93 F.3d 1537, 1541–42 (Fed. Cir.1996). Plaintiffs' claims for imputed interest on GCEP and High Assay Costs were not presented to the contracting officer. *See* Pls.' Mem. of Contentions of Fact and Law, filed Mar. 27, 2001, at 39.

■ Plaintiffs dismiss their failure to present these claims to the contracting officer as of no consequence, because these were not "new" claims at all. According to plaintiffs, the original claim asserting that DOE improperly charged plaintiffs for enrichment services purchased during FY 1993 encompassed the imputed interest and High Assay claims. While it is true that a "monetary claim properly considered by the contracting officer ... need not be certified or recertified if that very same claim (but in an amount reasonably based on further information) comes before ... a court," *Tecom, Inc. v. United States*, 732 F.2d 935, 938 (Fed.Cir. 1984) (emphasis omitted), plaintiffs' challenged claims do not come within this description. Plaintiffs' original claim was based on the inclusion of remedial action and depleted uranium costs in the FY 1993 price. The imputed interest and High Assay Costs are entirely new claims because plaintiffs came to realize that perhaps those amounts might have been included improperly for many years before 1993. Moreover, the High Assay Costs dealt with costs and financial statements that were completely different from the evidence presented in plaintiffs' remedial action costs and depleted uranium disposal claims. Thus, these claims are entirely different from those presented to the contracting officer.

■ Similarly, the claim based on breach of the implied covenant of good faith and fair dealing was not presented to the contracting officer, and this court lacks jurisdiction over it under the CDA.

### 2) *The Tucker Act*

■ Plaintiffs press a secondary jurisdictional argument under the Tucker Act.[18] The Court of Federal Claims obtains jurisdiction over monetary claims against the federal government under the Tucker Act. This jurisdiction extends to actions brought within six years after the claim first accrues. *See* 28 U.S.C. § 2501. For the purposes of section 2501, a "cause of action against the government has 'first accrued' only when all the events which fix the government's alleged liability have occurred *and* the plaintiff was or should have been aware of their existence." *Hopland Band of Pomo Indians v. United States*, 855 F.2d 1573, 1577 (Fed.Cir. 1988).

■ Defense counsel attempted to demonstrate that documentary evidence available since 1986 should have apprised plaintiffs of their imputed interest and High Assay claims. The write-off on the principal for the GCEP investment was announced in 1986. Similarly, DOE addressed High Assay Costs that same year. However, even given this information, plaintiffs demonstrated that it was not until they were given key financial documents (a FY 1992 financial statement titled "Schedule K–6A") that they were able to formulate the basis of these claims. These documents were made available to plaintiffs during May 2000, well after the Federal Circuit's remand in 1999. It was at this time that plaintiffs should have been aware of the

---

**17.** *See infra* section 3.

**18.** The difference between jurisdiction under the CDA and the Tucker Act is not merely academic. Under the CDA interest is available on a claim calculated from the date on which the claim was filed with the contracting officer until the date of judgment. 41 U.S.C. § 611. The Tucker Act makes no such provision for interest.

existence of all the events which fixed the Government's liability.

■ The same can be said for plaintiffs' good faith and fair dealing claim. This claim was based almost exclusively on the Smith Barney report, which was furnished during the post-remand discovery. Thus, while plaintiffs have not sustained their burden of proof with respect to the claims based on good faith and fair dealing, imputed interest, and High Assay Costs, plaintiffs brought them well within the six-year statute of limitations, so jurisdiction is present to consider these claims under the Tucker Act.

Defendant questions whether jurisdiction can be maintained under the Tucker Act over these claims. As defendant points out, the USC contains a disputes clause requiring compliance with the CDA's provisions. "Where a federal contract contains such a disputes clause, and also provides a specific administrative remedy for a particular dispute, the contractor must exhaust its administrative contractual remedies prior to seeking judicial relief." *Maine Yankee Atomic Power Co. v. United States*, 225 F.3d 1336, 1340 (Fed.Cir.2000). The Federal Circuit held in *Maine Yankee* that a contractor was required to exhaust administrative remedies set forth in a disputes clause for any claims "arising under" the contract. *Id.* In *Maine Yankee* the disputes clause was not a CDA disputes clause, but a pre-CDA standard disputes clause inserted because the parties were aware that the CDA did not apply to the government services contract at issue.[19] The disputes clause in the USC is a CDA clause and not a standard disputes clause. Defendant cannot insist that plaintiffs obtain a contracting officer's decision that is required under a CDA disputes clause when defendant urges that the CDA is inapplicable to the contracts in issue. Indeed, defendant seeks to extract a lone requirement from the CDA disputes clause—obtaining a contracting officer's decision—in order to block plaintiffs from bringing an action in court, while ignoring those parts of the disputes clause

that would predicate such a decision on CDA jurisdiction.

As discussed in the following section, defendant is correct that the claims cannot proceed under the CDA. Therefore, in this instance, "the appeal procedure is inadequate or unavailable . . . ." *United States v. Joseph A. Holpuch Co.*, 328 U.S. 234, 240, 66 S.Ct. 1000, 90 L.Ed. 1192 (1946), and plaintiffs were not required to utilize the administrative procedures spelled out by the CDA disputes clause.

### 3) *Jurisdiction over the remedial action and depleted uranium claims*

■ The court deals separately with defendant's arguments that jurisdiction is lacking over the remedial action and depleted uranium claims for two reasons. First, these claims were presented to the contracting officer, while the imputed interest, High Assay Costs, and good faith and fair dealing claims were not. Second, plaintiff has established an entitlement to recovery under the remedial action and depleted uranium claims, in contrast to its other claims.

"Congress created the Contract Disputes Act to promote economy, efficiency and effectiveness in the government's procurement of goods. Accordingly, the associated regulations emphasize the buyer-seller relationship." *G.E. Boggs & Assoc., Inc. v. Roskens*, 969 F.2d 1023, 1027 (Fed.Cir.1992). The CDA "does not cover all government contracts." *Coastal Corp. v. United States*, 713 F.2d 728, 730 (Fed.Cir.1983). The CDA applies to contracts entered into by an executive agency for

(1) the procurement of property, other than real property in being;

(2) the procurement of services;

(3) the procurement of construction, alteration, repair or maintenance of real property; or

(4) the disposal of personal property.

41 U.S.C. § 602(a).

Braced by this principle, and undeterred by the fact that the Federal Circuit issued an

---

**19.** The contract in *Maine Yankee* was for disposal of spent nuclear fuel and high-level radioactive waste.

opinion in this case premised on CDA jurisdiction, defendant deems the USC not to be the type of enrichment contract covered by the CDA. No dispute exists that the USC was a vehicle for the Government to provide enrichment services. Defendant maintains that the CDA "does not cover the furnishing (as distinguished from the procurement) of services by the government." *Maine Yankee*, 225 F.3d at 1340.

Plaintiffs, justifiably skeptical of defendant's eve-of-trial *volte face*, detail the factual circumstances surrounding the provision of the enrichment services. Mr. Schwartz testified that utilities delivered property, namely nuclear feed material to DOE and DOE acquired title to this property. Section 9(b) of the General Terms and Conditions of the USC confirms this arrangement, stating "[t]itle to such material shall pass to the Government upon delivery . . . ." This feed material is then commingled with feed material provided by other utilities. After the feed material is enriched, two products result: enriched uranium and depleted tails. A customer then receives the enriched uranium, which is not necessarily derived from the same feed material that the customer supplied to DOE. The customer takes title to the enriched uranium and the customer can elect to take title to the depleted tails, although no customers have done so.

It is the initial step of acquiring title to the feed material that plaintiffs contend is the "procurement of property" within the meaning of section 602(a)(1), and the final step of delivering enriched uranium that plaintiffs contend is the "disposal of personal property" within the meaning of section 602(a)(4). Both contentions are unavailing.

Based on the facts of record and the language of the USC, the court concludes, first, that the transfer of title is incidental to the enrichment services provided under the USC and does not rise to the level of "procurement" or "disposal" of property. Each contract with the utilities "represents a 30–year obligation for the provision of enrichment services by DOE." USC art. II. That title shifts during the provision of these services cannot override this contractual language. Second, plaintiffs' contention that the Government contracted for the "disposal of personal property" under section 602(a)(4) is illusory. The utilities could elect, even now, to acquire the depleted tails and the Government would have no further "disposal" obligation. The court holds that the CDA does not apply to the enrichment services contracts.

This holding stands notwithstanding plaintiffs' protestations that the parties intended the CDA to apply and that the Federal Circuit so assumed in its remand. As an initial matter, the parties' intent is not sufficient to confer jurisdiction on this court. *Gould v. Control Laser Corp.*, 866 F.2d 1391, 1393 (Fed.Cir.1989). A closer question is presented by the Federal Circuit's analysis. It is true that the Federal Circuit implicitly recognized that the appellate argument to dismiss the case rested on defendant's assertion that the utilities had not complied with the CDA. Defendant accused the utilities of "'artful manipulation of the CDA process,'" *Florida Power & Light*, 198 F.3d at 1361, because the utilities had not supplemented their complaints after a decision by a contracting officer in a separate case that sought recovery for enrichment services pricing by the USEC.

Furthermore, the Federal Circuit was referring to the CDA when it stated that "[t]he utilities were required to submit their claims to the appropriate contracting officer in order for jurisdiction to vest in the Court of Federal Claims. . . . [I]n this case the contracting officer was at DOE." *Florida Power & Light*, 198 F.3d at 1360. However, "[i]t is a truism that bears repeating that broad language in an opinion must be read in light of the issue before the court." *Northern States Power Co. v. United States*, 224 F.3d 1361, 1367 (Fed.Cir.2000). While the Federal Circuit ruled that the *Barsebäck, Centerior,* and *Yankee Atomic* cases were distinct from the cause of action in this case and that *res judicata* did not bar the instant action, it did not directly address CDA jurisdiction. The Federal Circuit did not adopt defendant's arguments urging dismissal (which related almost entirely to the CDA), and thus the Federal Circuit's reliance on CDA jurisdiction was incidental to its ultimate decision.

This situation points up the Hobson's choice that defendant's recent change of position presents to the court. Defendant based all of its previous arguments on the assumption that plaintiffs' claims were CDA claims. All the parties proceeded on this assumption. Nonetheless, jurisdiction is a matter that can be raised at any time, *Fanning, Phillips & Molnar v. West*, 160 F.3d 717, 720 (Fed.Cir. 1998), and defendant did so on the eve of trial. The court was left with two unattractive options: to rule on the jurisdictional issues and foreclose proof on certain claims, only to run the risk that, if jurisdiction were later found to be present, the factual record would become even more stale; or defer ruling on jurisdiction for post-trial briefing and run the risk that some rulings will be gratuitous. Given the imminence of trial, the court opted for the latter course. Having reviewed the statutory mandate of 41 U.S.C. § 602(a), the court holds that the CDA does not confer jurisdiction on plaintiffs' claims. Thus, as defendant has conceded, "any jurisdiction must be under the Tucker Act." Def.'s Br. filed Apr. 13, 2001, at 3.

Having found that CDA jurisdiction is lacking and that this case is governed by the Tucker Act, the jurisdictional odyssey gives rise to one additional issue. Two plaintiffs, Duke and Virginia Power, filed their complaints with this court on January 25, 2001. Thus, in order to retain jurisdiction under 28 U.S.C. § 2501, their respective causes of action must have "first accrued" no earlier than January 25, 1995.

The seven original plaintiffs submitted claims for "D & D and Remedial Costs" in various amounts in July 1995. Plaintiffs' submissions sought $589 million in D & D costs and $451 million in remedial action costs, for a total of $1.040 billion. However, the contracting officer's October 1995 decision (the Parks Letter) rejected this formulation of the $1.040 billion figure present in the FY 1993 price. Instead, the Parks Letter identified $754.7 million included for "remedial and response action costs from FY 1988 to FY 1991" and $245.3 million forecasted for "future remedial action accrual." These amounts total approximately $1 billion. The Parks Letter also discussed the $520 million for disposing of depleted uranium. Plaintiffs argue that the contracting officer's October 13, 1995 decision on the original seven plaintiffs' claims caused the utilities claims to first accrue, because it was the Parks Letter that first elucidated DOE's pricing analysis. In other words, plaintiffs had a sense of the amount they were overcharged, but were unable to articulate the exact bases for that amount until the Parks Letter issued.

One of the most striking facts proved at trial was the difficulty that plaintiffs encountered in deconstructing the FY 1993 price. The Parks Letter provided the first analysis that plaintiffs had obtained; indeed, the Parks Letter corrected several of plaintiffs' key assumptions. In these circumstances assigning a date earlier than October 13, 1995 as the commencement of the limitations period is unjustified. 25 U.S.C. § 2501 allows a claimant six years from that date to file a complaint. Because Duke and Virginia Power filed on January 25, 2001, their complaints were filed within the statute of limitations.

## CONCLUSION

Accordingly, based on the foregoing,

**IT IS ORDERED**, as follows:

1. Judgment shall enter for plaintiffs on the remedial action costs and depleted uranium claims.

2. Judgment shall enter for defendant on the imputed interest on GCEP, High Assay Costs, and good faith and fair dealing claims.

3. By August 13, 2001, the parties shall file a stipulation of damages, which shall be calculated consistent with PX 81. Interest under the CDA cannot be awarded.