MAYER, Circuit Judge.
Barseback Kraft AB and Empresa Nacional del Uranio, S.A. appeal the summary judgment of the United States Court of Federal Claims, 36 Fed. Cl. 691 (1996), dismissing their complaint that the United States Enrichment Corporation had overcharged them for uranium enrichment services. Because (1) the contracts at issue permit the government to charge any price below the ceiling, (2) the government has not violated any alleged treaty rights, and (3) the government is not recovering its decommissioning and decontamination costs twice, we affirm.

Background

Empresa Nacional del Uranio, S.A. (ENUSA) is a nuclear fuel cycle company owned by Spain that purchases fuel for nuclear power plants there. On March 20,1974, the United States and Spain entered a treaty styled “Atomic Energy: Cooperation for Civil Uses” (Spanish Treaty). Pursuant to this treaty, if Spain, or authorized persons, want to obtain uranium enrichment services from the United States, they will “have access on an equitable basis with other purchasers of such services to uranium enrichment capacity then available in [Atomic Energy] Commission facilities and not already allocated.” The Spanish Treaty also states that “the agreed delivery schedules and other terms and conditions of supply” will be set forth in “firm contracts.”
Barseback Kraft AB (Barseback) is a Swedish energy company that owns and operates a commercial nuclear power plant. In December 1983, the United States and Sweden executed an “Agreement for Cooperation Between Sweden and the United States of America Concerning Peaceful Uses of Nuclear Energy” (Swedish Treaty). This treaty did not specifically mention uranium enrichment services. A subsequent letter from the American Ambassador to Sweden to the Swedish Minister for Foreign Affairs, however, states: “With respect to any contract executed between the United States Atomic Energy Commission and the Government of Sweden or authorized persons under, its jurisdiction ... charges for enrichment services ... will be those in effect for users in the United States of America at the time of delivery.”
In 1984, Barseback and ENUSA entered contracts with the United States to purchase fixed percentages of their enriched uranium needs from the Department of Energy (DOE). The duration of the contracts is thirty years or the life of the longest operating nuclear power facility included under the contracts, whichever is shorter. Barseback and ENUSA may terminate their contracts upon ten years’ notice.
Of particular importance to this ease is the pricing provision of the contracts, article IVG).[1] It states that “[t]he charges to be paid to DOE for enrichment services provid *1478 ed to the Customer hereunder will be determined in accordance with the established DOE pricing policy for such services.” Article 1(8) defines “established DOE pricing policy” as “any policy established by DOE that is applicable to prices or charges in effect at the time of performance of any services under this contract.” Additionally, the price cannot exceed a “ceiling charge,” which fluctuates under the contracts’ formula, accounting for changes in electrical rates and the purchasing power of the dollar. Article IV(1).
The “established DOE pricing policy” at the time the parties contracted was that DOE’s prices would recover only the government’s costs over a reasonable period of time. This policy was mandated by section 161(v) of the Atomic Energy Act of 1954, which provided that “any prices established under this subsection shall be on a basis of recovery of the Government’s costs over a reasonable period of time.” 42 U.S.C. § 2201(v) (1988). Section 161(v), as amended, also directed DOE [2] to “establish criteria in writing setting forth the terms and conditions under which services provided under this subsection shall be made available.” Id. Pursuant to this directive, see 10 C.F.R. § 762.1(a) (1987) (“these criteria are established pursuant to section 161(v)”), DOE published its Uranium Enrichment Services Criteria (Enrichment Criteria). The final Enrichment Criteria were published in 1986 and echoed section 161(v)’s cost-recovery based pricing policy. See id. § 762.5. The Enrichment Criteria also listed the costs included in DOE’s charge, which included, inter alia, certain decontamination and decommissioning (D & D) costs.
Subsequently, Congress enacted the Energy Policy Act of 1992 (Energy Policy Act), which made three significant changes in the government’s uranium enrichment services program. First, it transferred responsibility for administering the program from DOE to the newly-created United States Enrichment Corporation (USEC). See 42 U.S.C. § 2297c(a) (1994). USEC is wholly owned by the government, with the United States Treasury as the sole shareholder, and ultimately it is to be privatized. Importantly, all of DOE’s existing uranium enrichment contracts, including Barsebáck’s and ENUSA’s, were transferred to USEC. See id. § 2297c(b)(l).
Second, the Energy Policy Act eliminated section 161(v)’s cost-recovery based pricing policy. Instead, Congress directed USEC to “establish prices for its products, materials, and services provided to customers other than [DOE] on a basis that will allow it to attain the normal business objectives of a profitmaking corporation.” Id. § 2297c-l(a). Stated otherwise, Congress changed the government’s pricing strategy from one based on recovering just its costs to one aimed at “profit maximization.” H.R.Rep. No. 102-474(1), at 200 (1992), reprinted in 1992 U.S.C.C.A.N. 1954, 2023.
Third, this act created the Uranium Enrichment Decontamination and Decommissioning Fund (D & D Fund). 42 U.S.C. § 2297g. It was designed to “accumulate the monies required to clean up the old uranium enrichment plants,” over fifteen years. Yankee Atomic Elec. Co. v. United States, 112 F.3d 1569, 1572 (Fed.Cir.1997). The D & D Fund is financed by deposits of $480 million per year, adjusted annually for inflation, from two sources: (1) a “special assessment” of up to $150 million collected from domestic utilities, and (2) congressional appropriations. Id.
On June 28, 1993, USEC informed Barsebáck and ENUSA (and other uranium enrichment customers) that effective July 1, 1993, their contracts would transfer to it, and their contract price of $125 per separative work unit (SWU), the common measure by which uranium enrichment services are sold, would remain the same on an interim basis. In further implementing the Energy Policy Act, USEC notified all uranium enrichment customers on June 24, 1994, that it was adopting a new pricing policy to replace the interim policy. The new policy provided that:
*1479 USEC prices will ensure that (i) the Corporation generates sufficient revenues to remain a viable, long-term supplier of uranium enrichment services, (ii) the United States Treasury, as the Corporation’s sole stockholder, receives a reasonable return on its investment in the uranium enrichment services business, and (iii) the price a customer pays for additional incremental uranium enrichment services purchased from USEC is competitive in the marketplace. USEC will retain the flexibility to respond to the circumstances of all customers by negotiating prices and other contract terms on an individual basis.
USEC also told its customers that the price of $125 per SWU would remain in force. Although Barseback and ENUSA have continued to pay $125 per SWU, USEC has given lower prices to purchasers who have renegotiated their contracts.
Barseback and ENUSA submitted certified claims[3] to the contracting officer in accordance with the Disputes clause of their contracts, seeking damages caused by USEC: (1) failing to set prices in accordance with the cost-recovery methodology; (2) pricing its services uncompetitively and discriminatorily, in violation of the Swedish and Spanish Treaties and the government’s duty of good faith and fair dealing; and (3) double-charging for D & D costs by purportedly including charges for these expenses in its uranium enrichment prices, while simultaneously collecting these costs from domestic utilities via the special assessment. The contracting officer denied the claims. Barseback and ENUSA then filed suit in the Court of Federal Claims, which granted the government’s motion for summary judgment. Barseback and ENUSA appeal.

Discussion

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986). We review the Court of Federal Claims’ grant of summary judgment de novo, drawing all justifiable factual inferences in favor of Barseback and ENUSA. Winstar Corp. v. United States, 64 F.3d 1531, 1539 (Fed.Cir.1995) (in banc), aff'd, — U.S. -, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). The underlying questions of contract and treaty interpretation are both questions of law, which we also review de novo. Olympus Corp. v. United States, 98 F.3d 1314, 1316 (Fed.Cir.1996) (contract); Cook v. United States, 86 F.3d 1095, 1097 (Fed.Cir.1996) (treaty).
Barseback and ENUSA argue that the court erred in granting summary judgment because: (1) the contracts’ pricing provision was ambiguous, thus raising factual issues not properly resolved by summary judgment; (2) the government breached the Swedish and Spanish Treaties by charging other customers lower prices; and (3) the government improperly double-recovered its D & D costs.[4] Each of these issues requires us to interpret Barsebaek’s and ENUSA’s contracts. In doing so, we begin with their plain language. McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1435 (Fed.Cir. 1996); C. Sanchez and Son, Inc. v. United States, 6 F.3d 1539, 1543 (Fed.Cir.1993) (“A contract is read in accordance with its express terms and the plain meaning thereof.”). If the provisions are clear and unambiguous, a court will give them their plain and ordinary meaning and will not resort to parol evidence. McAbee, 97 F.3d at 1435. The second issue additionally requires us to interpret the Swedish and Spanish Treaties, an exercise we undertake using the same general principles, remembering that treaties are to “be construed broadly to accomplish the intent” of the sovereigns. Compagnie Fin *1480 anciere de Suez et de L’Union Parisienne v. United States, 203 Ct.Cl. 605, 492 F.2d 798, 810 (1974). Applying these established rules, we disagree that the court erred in construing the agreements at issue or in granting summary judgment. We address each issue in turn.
A. Contract Ambiguity
In support of their primary argument that the contracts’ pricing policy is ambiguous,[5] Barsebáck and ENUSA draw three arrows from their collective quiver. First, they argue that price must be based on DOE’s, not USEC’s, established policy, which was the cost-recovery based policy set forth in the Enrichment Criteria. Thus, USEC’s profit-maximization policy violates their contracts. Second, they contend that the word “any,” found in the pricing provision, is itself an ambiguous term, whose meaning is derived only from its context, thus requiring a trial to examine parol evidence. Finally, they offer that two of their contracts’ recital clauses cloud the meaning of the pricing provision, thus requiring a trial to sort out the contracts’ true policy. In the end, the arrows miss their mark.
Article IV(1), “Charges for Enrichment Services — Ceiling Charge — Other Charges,” sets forth the contracts’ pricing policy. It states that the “charges to be paid to DOE” for enrichment services will “be determined in accordance with established DOE pricing policy” but will not exceed the ceiling, which varies annually. The contracts define “established DOE pricing policy” as “any policy established by DOE that is applicable to prices or charges in effect at the time of performance of any services under this contract.” Article 1(8). We see no ambiguity in this provision. The contracts state that the price to be paid is to be determined by the policy existing at the time the uranium enrichment services are provided. When the services at issue were provided, the government’s policy was to charge an amount that recovered not just its costs but also produced a profit, while remaining below the ceiling. We find nothing in the pricing provision or elsewhere in the contracts that limits USEC’s ability to price its services in this manner, which, of course, is mandated by statute.
Notwithstanding, Barsebáck and ENUSA argue that the contract literally requires that the price be determined in accordance with DOE’s pricing policy, not USEC’s. They say that during the years in question, 1993 and 1994, the established DOE pricing policy was the cost-recovery policy set forth at 10 C.F.R. Part 762, which was not formally withdrawn from the Code of Federal Regulations until 1995. See Removal of Obsolete Regulations, 60 Fed.Reg. 49,195, 49,196 (1995) (stating that the statutory authority for Part 762 was superseded by the Energy Policy Act). Thus, they argue, that policy controlled the government’s pricing in 1993 and 1994. This argument fails for at least two reasons. First, DOE could not have had any valid uranium enrichment pricing policy in 1993 and 1994 because Congress had stripped it of its authority to sell uranium enrichment services. It had transferred that responsibility to USEC. Second, the statutory authority upon which that regulation rested, section 161(v), was repealed by the Energy Policy Act. It was replaced with a new policy to price uranium enrichment services to maximize profits. USEC was not constrained to base its prices on a cost-recovery basis. To the contrary, it was required to operate as a profit-seeking entity. The fact that DOE’s Enrichment Criteria had not been formally withdrawn from the Code of Federal Regulations does not save them from invalidity. A “regulation cannot override a clearly stated statutory requirement.” Aerolineas Argentinas v. United States, 77 F.3d 1564, 1575 (Fed.Cir.1996) (citing Brush v. Office of Personnel Management, 982 F.2d 1554, 1560 (Fed.Cir.1992) (“regulation must be held to be invalid since it does not comport with the clear statutory mandate”)); see also United States v. Larionoff, 431 U.S. 864, 873, 97 S.Ct. 2150, 2156, 53 L.Ed.2d 48 (1977) (a regulation is valid only if it is consistent *1481 with the statute under which it was promulgated).
Nor is there merit to the argument that the inclusion of “any” in the pricing provision renders that clause ambiguous. The “word ‘any1 is generally used in the sense of ‘all’ or ‘every’ and its meaning is most comprehensive.” Fleck v. KDI Sylvan Pools, Inc., 981 F.2d 107, 115 (3rd Cir.1992) (quoting McCormick v. Columbus Conveyer Co., 522 Pa. 520, 564 A.2d 907, 910 (1989)); see also United States v. Rosenwasser, 323 U.S. 360, 362-63, 65 S.Ct. 295, 296-97, 89 L.Ed. 301 (1945) (“any” employee means all employees under the Fair Labor Standards Act, unless specifically excluded). This word does not introduce ambiguity into the pricing provision, it gives it breadth. While Barseback and ENUSA are correct that Black’s Law Dictionary states that “any” “may be restricted by the context” in which it is used, there is nothing in their contracts that robs “any” of its plain and expansive meaning. The fact that the parties entered their contracts at a time when the 1979 Enrichment Criteria were in effect neither limits the phrase “any policy” to the cost-recovery based policy found in those criteria, as Barseback and ENUSA appear to argue, nor otherwise reins in its scope.
Finally, Barseback and ENUSA claim that two recital clauses in their contracts render the agreements ambiguous. The first states, emphasis added, that “DOE intends to serve as a rehable long-term supplier of uranium enrichment services at predictable prices while providing the most competitive prices possible through technological innovation.” The second “Whereas” clause states, emphasis added, that “DOE desires to operate the enrichment complex on a sound business basis without Government subsidy.” Again, these clauses do not render'ambiguous the contracts generally or the pricing provision specifically. The first expresses DOE’s aim to rely on technological innovation to price it's services as competitively as possible. The second expresses only the government’s desire to operate its uranium enrichment program in a self-sufficient manner. Moreover, facially these clauses express only desires, not binding commitments. Barseback and ENUSA’s argument that these clauses mandate that the government offer the most competitive possible price while avoiding the need for a government subsidy would give the government very little, if any, latitude to price its services other than on a cost-recovery basis. Indeed, this construction would essentially strip the government of the broad discretion the pricing provision accords it.
The contracts, however, place the risk of any changed government pricing policy on Barseback and ENUSA. In this respect, this case is the other side of the Winstar coin. The agreements at issue in United States v. Winstar, Inc., — U.S. -, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996), upon which Barseback and ENUSA rely, permitted healthy thrifts that merged with ailing ones to count “supervisory goodwill” obtained through the mergers towards the capital reserve requirements imposed by federal regulations. Id. at-, 116 S.Ct. at 2442. Congress later legislated that thrifts may not use supervisory goodwill to meet capital reserve requirements, causing numerous thrifts to file breach of contract suits. The Court construed the agreements at issue to shift the risk of loss to the government, thus requiring it to “indemnify its contracting partners against financial losses arising from regulatory change.” Id. at-, 116 S.Ct. at 2461. In other words, the risk of any policy change resided with the government.
Here, on the other hand, the risks associated with any change in the government’s pricing policy are allocated to Barseback and ENUSA. The contracts do not set a firm price that will govern the thirty-year lives of the contracts. Rather, they say that the price will be dictated by the pricing policy in effect at the time the services are delivered. This provision reflects the parties’ recognition that the pricing policy would change over the contracts’ lives. Of course, this does not just require Barseback and ENUSA to swallow any price increase, which, at least in whole dollar terms, has not occurred; it gives them the benefit of any price decrease as well.
*1482 B. Treaty Violations
Barsebáck and ENUSA next contend that by offering lower prices to utilities entering new contracts, USEC has violated the treaties between the United States and their respective governments. The Spanish Treaty grants Spain “access on an equitable basis with other purchasers of [uranium enrichment] services to uranium enrichment capacity then available in Commission facilities and not already allocated.” Importantly, it also states that the services will be provided under the terms and conditions set forth in firm contracts.[6] This treaty requires only that ENUSA be given access to the government’s available uranium enrichment services to the same extent as other purchasers. The price of these services, though, is governed by the provisions of its contract. ENUSA does not claim that it has been denied the right to secure uranium enrichment. Indeed, it continues to acquire such services from USEC in accordance with the pricing terms of its contract. USEC has not abrogated any treaty right of ENUSA.
Similarly, Barsebáck has been not deprived of its treaty rights. The Swedish Treaty does not address enriched uranium services at all. Diplomatic correspondence, however, provides that with respect to any contract that Sweden, or authorized persons, execute with the government, charges for enrichment services will be those in effect for users in the United States at the time of delivery. Barsebáck does not argue that other users in the United States are not also being charged $125 per SWU. Indeed, the base charge in effect during the period in question remained $125 per SWU. Moreover, the government represented at argument that every customer buying services under the same contracts as Barsebáck and ENUSA pay the same price. Instead, what Barsebáck contends is that by charging those customers who renegotiated their contracts less than $125 per SWU, USEC violated the treaty. But there is nothing in the treaty or in the diplomatic correspondence that guarantees Barsebáck the lowest price. The treaty is silent on pricing. The diplomatic correspondence says only that charges for enrichment services will be those in effect for users in the United States at the time of delivery.
Moreover, Barsebáck and ENUSA were free to approach USEC to renegotiate their contracts; they simply failed to do so. In June 1993, when the government notified its customers of its interim policy of maintaining the existing prices, it simultaneously notified them that the pricing policies were “subject to change, modification, or revision ... as mutually agreed by the parties.” A year later, in June 1994, USEC informed its customers that the “base price” for enrichment services would remain at $125 per SWU, but “USEC will retain the flexibility to respond to the circumstances of all customers by negotiating prices and other contract terms on an individual basis.” Under these circumstances, we cannot conclude that USEC’s pricing violates the Swedish Treaty.
C. Double-Recovery of D & D Costs
Barsebäck and ENUSA’s final allegation is that the government is improperly double-recovering its D & D costs. First, DOE is recovering them from domestic utilities via the special assessment. See Yankee, 112 F.3d at 1572. Second, USEC is allegedly recovering them because D & D costs were a component of DOE’s price, and USEC has not decreased its price, even though it is not charged with recovering D & D costs. Consequently, the argument goes, USEC must be recovering D & D costs. Assuming Barsebáck and ENUSA have standing to bring this claim,[7] it is nevertheless unavailing. First, it is beyond dispute that USEC is not literally charging its customers an amount used for, or intended to finance, the government’s D & D efforts. See 42 U.S.C. *1483 § 2297g-l (D & D fund is financed by only two sources: the special assessment and annual appropriations); see also id. § 2297c-2(d) (DOE is responsible for paying D & D costs for pre-existing conditions).
Second, the fact that USEC, which has a very different pricing mandate from that which DOE had, did not decrease the price of uranium enrichment services after it assumed DOE’s prior responsibilities does not mean the government is double-recovering. Barseback and ENUSA are, quite simply, comparing apples to oranges. DOE’s cost-recovery based pricing policy included a D & D component. USEC’s profit-maximization policy, on the other hand, requires it to set prices in a profitable manner. In light of these quite different policies, USEC’s failure to decrease its price indicates nothing more than that it believes that price “will allow it to attain the normal business objectives of a profitmaking corporation.” 42 U.S.C. § 2297c-l. It does not mean USEC is recovering D & D costs. As the trial court correctly stated, “[USEC’s] prices do not bear a direct relationship to the cost structure on which the DOE based its prices.” 36 Fed. Cl. at 707.

Conclusion

Accordingly, the judgment of the United States Court of Federal Claims is affirmed.

AFFIRMED.

. Citations to article numbers refer to the articles conlained in the contracts.

. This congressional direction was originally given to the Atomic Energy Commission, which was responsible for administering the uranium enrichment services program before 1977, when that responsibility was transferred to DOE. For simplicity, we refer to both agencies as DOE.

. The claims ol Barseback and ENUSA were identical except for the dollar amounts claimed, which depended upon the amount of uranium enrichment services purchased.

. Barseback and ENUSA also contend that the court erred in not permitting discovery. However, we do not see that the court abused its discretion in this regard. See New Am. Shipbuilders, Inc. v. United States, 871 F.2d 1077, 1081 (Fed. Cir. 1989). Nor do we find error in the court’s rejection of the argument that USEC’s pricing policy breached the government's duty of good faith and fair dealing.

. Although framed as arguments that the contracts are ambiguous, Barsebáck and ENUSA essentially argue, in part, that USEC’s pricing policy breaches their contracts.

. ENUSA complains that the court improperly relied on paragraph C, instead of paragraph A, of Article VII of the Spanish Treaty in concluding that the treaty states that the terms of any contracts would be agreed upon in the future, see 36 Fed. Cl. at 704. However, paragraph A contains substantively identical language.

. The government argues that they do not have standing because they are not being double-charged since they are not domestic utilities subject to the special assessment.