**FLORIDA POWER & LIGHT COMPANY, Consolidated Edison Company of New York, Inc., Empresa Nacional Del Uranio, S.A., IES Utilities, Inc., Niagara Mohawk Power Corporation, Pennsylvania Power and Light Company, Wisconsin Electric Power Company, Duke Energy Corporation, and Virginia Electric and Power Company, Plaintiffs,**

v.

**The UNITED STATES, Defendant.**

No. 96–644C.

United States Court of Federal Claims.

May 28, 2003.

Alexander D. Tomaszczuk, McLean, VA, for plaintiff. John H. O'Neill, Jr., Michael G. Lepre, and Daniel S. Herzfeld, Shaw Pittman, of counsel.

James G. Bruen, Jr., Washington, DC, with whom was Assistant Attorney General Robert D. McCallum, Jr., for defendant. Matthew J. Troy, Department of Justice, and Marc E. Kasischke, Department of Energy, of counsel.

## OPINION

MILLER, Judge.

Before the court after remand from the Federal Circuit is a case brought by utility companies that produce nuclear power to recover overpayments for enrichment of uranium. Plaintiffs take the position that the case has been remanded for further development of the record; defendant urges in its Motion for Entry of Judgment on the Record, which is the subject of this opinion, that the matter can be resolved on the existing record. Argument has been held on defendant's motion.

The mandate, as interpreted by defendant, requires the trial court to determine whether the Department of Energy ("DOE") suffered a large cumulative unrecovered loss from enrichment operations, such that pricing at a mandatory ceiling would have been insufficient to recover its loss irrespective of whether DOE properly included certain costs in its pricing.[1] Plaintiffs read the mandate as requiring the Government to justify the inclusion of disputed costs in its pricing, and, to the extent that the Government seeks to justify the ceiling price based in part on costs that were the subject of the trial, giving plaintiffs the opportunity to challenge the appropriateness of those costs, which could

entitle them to an adjustment in their favor. The difference is not cosmetic. Defendant warns that if the court follows plaintiffs' interpretation, "[t]his ersatz theory is an invitation to error." Def.'s Br. filed Mar. 17, 2003, at 5. Plaintiffs counter: "While the Government may have confused the Court of Appeals sufficiently to achieve a remand to establish a record on its 'no injury' defense, it did so at its peril." Pls.' Br. filed Feb. 27, 2003, at 5.

"[A trial] court is free to take any action that is consistent with the appellate mandate, as informed by both the formal judgment issued by the court and the court's written opinion." *Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 137 F.3d 1475, 1484 (Fed.Cir. 1998).

Correct interpretation of a mandate is crucial to the administration of justice. If a trial court misapprehends a mandate, or if the parties are not in accord as to what has been directed and the judge cannot discern which approach is more consistent with the mandate, the result can be a waste of the parties' time and resources should the appellate court have intended a different course of action. The trial court's "actions on remand should not be inconsistent with either the letter or the spirit of the mandate." *Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 951 (Fed.Cir.1997) (citing *Quern v. Jordan*, 440 U.S. 332, 347 n. 18, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979)). However, "[i]t offends common sense ... to suggest that [the appellate court] must defer to what a trial judge inferred about *our* intent in what *we* wrote." *Laitram*, 115 F.3d at 951 (discussing *de novo* review of mandate).

Implementing the mandate in this case is complicated further because the mandate vacated and remanded the entire case after affirming several of the trial court's rulings, including those on legal issues. Although the trial court is not restricted to the terms of the judgment if the accompanying opinion indicates otherwise, *Exxon Chem.*, 137 F.3d

---

1. "At oral argument, the Federal Circuit tested whether the Government was trying to substitute specific costs for those this Court disallowed. The Government said it was not, that it was instead arguing that the utilities had not paid its total costs and thus plaintiffs suffered no damage. There is no official transcript of the argument. Counsel for each party have the audiotape." Def.'s Br. filed Mar. 17, 2003, at 10 n. 7.

at 1483, the court appreciates the parties' cooperation in agreeing on what rulings have been affirmed.[2]

## BACKGROUND

Plaintiffs Florida Power & Light Company; Consolidated Edison Company of New York, Inc.; Empresa Nacional Del Uranio, S.A.; IES Utilities, Inc.; Niagara Mohawk Power Corporation; Pennsylvania Power and Light Company; Wisconsin Electric Power Company; Duke Energy Corporation; and Virginia Electric and Power Company are nine utilities that entered into contracts— referred to collectively as the Utility Services Contract ("the USC")—with DOE whereby DOE, under the auspices of the Uranium Enrichment Activity (the "UEA"), supplied uranium enrichment services to plaintiffs. The established DOE pricing policy, defined by the USC as the policy in effect at the time services were performed, was to guide the determination of prices charged to the utilities by DOE. The pricing policy was set forth in the Uranium Enrichment Services Criteria, reciting that "DOE will establish charges for enrichment services on a basis that recovers appropriate Government costs over a reasonable period of time." 10 C.F.R. § 762.5 (1988); *see Florida Power & Light Co. v. United States*, 49 Fed.Cl. 656, 659 (2001) (*"Florida Power III"*), *vacated and remanded*, 307 F.3d 1364 (Fed.Cir.2002) (*"Florida Power IV"*). Section 161(v) of the Atomic Energy Act of 1954 mandated this policy. *See* 42 U.S.C. § 2201(v) (1988).

As discussed in more detail in *Florida Power III*, DOE charged its utility customers for enrichment services from 1984 through June 30, 1993. Pursuant to the Energy Policy Act of 1992, 42 U.S.C. § 2297 (1992) ("EPACT"),[3] DOE disengaged from providing the services. EPACT created the Urani-

um Enrichment Decontamination and Decommissioning Fund (the "D & D Fund") to pay the decontamination and decommissioning costs of DOE, as well as the annual cost of so-called remedial action. *See* 42 U.S.C. § 2297g–2(b), (c). After EPACT was enacted on October 24, 1992, DOE continued to charge the utilities during a transition period ending June 30, 1993, using the Fiscal Year ("FY") 1993 price. Plaintiffs challenged, for the transition period, the components of DOE's price per Separative Work Unit ("SWU"), which was a unit of measurement for the enrichment services. The ceiling price for FY 1993 was $125.34 per SWU. *See Florida Power III*, 49 Fed.Cl. at 662.

Insofar as the efforts of this judge are concerned, the case began after transfer on September 29, 2000. At that time the case stood in the posture of remand. The Federal Circuit had reversed a judgment for defendant entered on the prior judge's decision, which dismissed the action based on the doctrine of *res judicata*. *See Florida Power & Light Co. v. United States*, 41 Fed.Cl. 477 (1998) (*"Florida Power I"*), *rev'd and remanded*, 198 F.3d 1358 (Fed.Cir.1999) (*"Florida Power II"*). The appeals court remanded for the resolution of three issues: 1) whether DOE had a cost-based pricing policy during the transition period between October 24, 1992, and June 30, 1993; 2) whether any purported costs that were included in DOE's contract price during that period were actually being defrayed from the D & D Fund; and 3) whether the inclusion of any purported costs that were being defrayed from the D & D Fund violated the utilities' contracts by violating the established DOE pricing policy for enrichment services applicable under Article IV of the contracts.[4] *See Florida Power III*, 49 Fed.Cl. at 660. These legal and factual questions

---

**2.** *See infra* note 4.

**3.** The Federal Circuit in *Barsebäck Kraft AB v. United States*, 121 F.3d 1475, 1478 (Fed.Cir. 1997), discussed the contrast between pricing under the Uranium Enrichment Services Criteria and EPACT.

**4.** In *Florida Power III*, this court answered each of the three questions after trial. The parties agree that the Federal Circuit affirmed the rulings on each of these issues. *See, e.g.,* Pls.' Br.

filed Feb. 27, 2003, at 4. In addition, this court tried plaintiffs' challenges to the improper inclusion of four cost components in the FY 1993 price. The appellate court vacated and remanded with respect to the court's rulings in plaintiffs' favor with respect to two of these cost components. *Florida Power IV*, 307 F.3d at 1368–69. Plaintiffs' challenges to the other two cost components had been tried over defendant's objection when plaintiffs introduced them after trial had been scheduled. The parties agree that the

were deemed essential to resolving whether DOE breached the pricing provisions of the enrichment services contracts by charging for decontamination and decommissioning costs that were defrayed out of the D & D Fund.

Pertinent to defendant's motion *sub judice* is this court's ruling that DOE's cost recovery calculations violated DOE's established pricing policy by 1) including a component for "remedial action costs" in the FY 1993 price; and 2) charging the utilities for disposal of depleted uranium in the FY 1993 price, because both costs should have been paid out of the D & D Fund. *See Florida Power III*, 49 Fed.Cl. at 662–65.[5]

Defendant argues that the pricing policy itself is cost based; the components of the ceiling price are essentially elements of a cost analysis to determine whether the price should be lower than the statutory ceiling. Because defendant maintains that it introduced evidence at trial that all costs cannot be recovered through the ceiling price, defendant objects to plaintiffs' effort to use the remand as an additional opportunity to challenge the costs included in DOE's cost analysis. According to defendant, DOE should be allowed to recover its large accumulated unrecovered loss to the extent that the pricing for FY 1993 does not exceed the ceiling, whether or not these costs were components

---

Federal Circuit affirmed the ruling excluding these claims as prejudicial to defendant. *Id.* at 1369–70.

One legal issue resolved by this court was defendant's challenge to the court's jurisdiction to hear plaintiffs' claims. The parties agree that the Federal Circuit affirmed the ruling on this issue. *See Florida Power IV*, 307 F.3d at 1374. Another legal issue concerned plaintiffs' claim to interest under the Contract Disputes Act of 1978, 41 U.S.C. §§ 601–613 (2002) (the "CDA"). The parties agree that the Federal Circuit affirmed the trial court's ruling on CDA interest. *Florida Power IV*, 307 F.3d at 1374. Thus, although the *Florida Power IV* mandate recites "Vacated and Remanded," *id.*, the parties agree that *Florida Power III* finally resolved all of the issues other than the issues that were returned to the trial court (and they disagree as to what these issues are).

*Florida Power IV* added one new factual issue, the provenance of which does not trace to earlier proceedings. The Federal Circuit stated:

The court, however, did not directly address the issue of what a reasonable time would be in the context of the transition period and the termination of DOE's responsibility for administering the enrichment contracts as of July 1993. The parties did not brief that issue to us, and it is of sufficient complexity that we believe the best course is to leave the matter to the trial court for decision on remand.

307 F.3d at 1369. The parties agree that the period of time was 12 years with respect to the FY 1993 costs. *See* Transcript of Proceedings, *Florida Power & Light Co. v. United States*, No. 96–644C, at 64–65 (Fed.Cl. Apr. 11, 2003) ("Tr. III"). As plaintiffs explain, the court did not make a finding of what would be a reasonable period of time "because there was no disagreement" between the parties. *Id.* at 22. However, the court understands the Federal Circuit to contemplate a finding of what would be the appropriate period of time (which DOE sets in its discretion) to recover costs if a price were to be hypothesized for DOE that would recover costs

based on a retrospective cost recovery analysis that included all of DOE's appropriate unrecovered costs. In the past DOE utilized ten years, and nothing would bind it to set a 12–year period.

In addition, *Florida Power IV* added one new legal issue—an issue that has not been raised in the six years since the complaint was filed:

The utilities' final argument is that even if the CDA does not apply, they are entitled to recover interest running from the date their claims were submitted because paragraph 7(h) of the enrichment contracts so provides. Although the utilities raised that issue belatedly, this case is being remanded to the trial court for further proceedings, and if a final judgment is entered in the utilities' favor, they can argue to the trial court at that time that they are entitled to interest based on paragraph 7(h) of the enrichment contracts. The fact that they relied on the CDA rather than the contract in seeking interest on the first judgment does not preclude them from asserting a contractual right to interest if there is a new judgment on remand.

307 F.3d at 1374.

5. This court also rejected, as introduced too late in the proceedings, plaintiffs' challenge to the inclusion of imputed interest on the Gas Centrifuge Enrichment Project (the "GCEP") and costs relating to High Assay Uranium in the FY 1993 price. Although the exclusionary ruling was affirmed, *see supra* note 4, the appeals court stated that these costs could be considered if the Government relied on them as other "appropriate government costs" to justify its FY 1993 price. *See Florida Power IV*, 307 F.3d at 1369. For purposes of its motion, defendant assumes that it would be inappropriate to recover the imputed interest. *See* Def.'s Br. filed Mar. 17, 2003, at 7 n. 6. Defendant does not rely on costs relating to High Assay Uranium, *i.e.*, these costs were never included in the cost recovery analysis. *Id.; see also Florida Power III*, 49 Fed.Cl. at 666–67.

of the FY 1993 price. Defendant further argues that the FY 1993 ceiling price, after deducting all the costs that plaintiffs challenge, including those that were not included in the price, does not recover DOE's accumulated costs. This argument is consistent with defendant's position throughout the proceedings before this judge.

This court rejected defendant's argument in ruling on a summary judgment motion that defendant brought before trial. *See* Def.'s Br. filed Jan. 31, 2001, at 12–14; Order entered March 22, 2001. This court rejected defendant's same argument at trial. *See Florida Power III*, 49 Fed.Cl. at 663. Plaintiffs do not dispute that defendant appealed this ruling. *See* Pls.' Br. filed Feb. 27, 2003, at 5. Once again, defendant advances this same position in its motion "for judgment [on the record] after a lengthy trial." Def.'s Br. filed Mar. 17, 2003, at 1. Defendant interprets the mandate as not requiring that defendant show the appropriateness of the costs that plaintiffs contest, but, rather, show that DOE had an unrecovered accumulated loss even excluding all challenged costs. *Id.* at 7.

Announcing that it "won" on appeal, *see* Transcript of Proceedings, *Florida Power & Light Co. v. United States*, No. 96–644C, at 15, 52 (Fed.Cl. Dec. 11, 2002) ("Tr.II"), defendant relies on the following language of *Florida Power IV*:

> The utilities assert that there is no need for a remand because the trial court has already rejected the government's factual submission that there were other appropriate government costs that would have allowed the government to keep the price at or near the ceiling price. We disagree. The trial court did not make any findings as to the government's factual argument that there were other appropriate costs that would justify the price charged during the transition period. We therefore remand for the trial court to determine whether the total amount of the appropriate government costs that could properly be considered in setting the price for Fiscal Year 1993 would justify the price of $125 per SWU, and if a lower price would

have been required, how much lower that price would have been.

307 F.3d at 1369. Defendant maintains that the remand requires the court to determine whether all appropriate government costs that properly could be considered justify the $125.00 SWU price for FY 1993 and to make this finding on the existing record. Def.'s Br. filed Jan. 24, 2003, at 14–15, 26.

Plaintiffs demur. They claim that the Federal Circuit agreed with their liability presentation. *See, e.g.*, Tr. II at 19 ("We believe that we won on our theory of the case. We believe that we won on the issues that were under the mandate."); Transcript of Proceedings, *Florida Power & Light Co. v. United States*, No. 96–644C, at 58 (Fed.Cl. Apr. 11, 2003) ("Tr.III") ("That's the case we tried. That's the case we won on."). Plaintiffs take the position that the appeals court ordered an adjudication of the "appropriate government costs." *Florida Power IV*, 307 F.3d at 1369.

The subject mandate issued upon review of a trial. All the rulings summarized in note 4 *supra* were reported in *Florida Power III*, 49 Fed.Cl. at 672. Neither plaintiffs nor the Government were foreclosed from discovering and trying any issue that they brought forward in a timely manner. Both parties at trial leveled all claims, arguments, and admissible evidence that they elected to litigate. Although two of plaintiffs' challenged cost components were rejected after trial because they were brought too late and thereby prejudiced defendant (a ruling upheld on appeal), this history only reinforces the fact that the parties put on their best cases. Therefore, it would appear that any issue as to which the court failed to make findings could be resolved on the record developed at the 2001 trial.

During the post-mandate scheduling conference, the court chided defendant for arguing that it was refused findings on appropriate costs. Because *Florida Power IV* contained language, discussed below, to the effect that defendant was seeking to justify the appropriateness of the cost components, the court did not appreciate that defendant had only advanced on appeal, as it had unsuccessfully pressed before the trial court,

its consistent position that DOE was not required to justify the cost components of the $125.00 SWU price. Def.'s Br. filed Jan. 24, 2003, at 9–12. Defendant argues that 1) the record developed at trial supports a finding that DOE incurred cumulative losses, even after excluding all challenged costs or costs that could have been challenged; and 2) plaintiffs' objections to the cost components under no scenario could establish that plaintiffs have suffered damages. *Id.* at 24–25.

Plaintiffs read the Federal Circuit's mandate differently. They point to language to the effect that defendant on remand may rely on certain costs questioned by plaintiffs "as part of [the Government's] challenge to the judgment [entered by the trial court] in favor of the utilities," *Florida Power IV*, 307 F.3d at 1370, and that "[t]he government cannot seek an adjudication of the appropriateness of those costs for its own purposes while preventing the utilities from obtaining the benefits of that adjudication if it is favorable to them," *id.* Plaintiffs infer that DOE must justify the cost components that it relies on to support the $125.00 SWU price from the following language in *Florida Power IV*:

> To the extent that the government on remand relies on the imputed interest and high-assay uranium costs [the two costs claims that the court excluded as untimely] as part of its challenge to the judgment in favor of the utilities, it will be necessary for the court to rule on the merits of those issues. If the court does so, and if it rejects the government's argument as to the appropriateness of those costs in whole or in part, the court's ruling not only would affect the government's argument as to remedy, but also would entitle the utilities to an adjustment of the underlying judgment in their favor. The government cannot seek an adjudication of the appropriateness of those costs for its own purposes while preventing the utilities from obtaining the benefits of that adjudication if it is favorable to them. Whether additional trial proceedings should be conducted to permit further development of the issues of imputed interest, high-assay uranium costs, and other claimed appropriate costs

is a matter for the trial court to decide in the exercise of its discretion.

307 F.3d at 1370.

Plaintiffs insist that reopening evidentiary proceedings is the correct response to the mandate. Pls.' Br. filed Feb. 27, 2003, at 40. Defendant insists that the Government is entitled to a ruling on whether DOE had sufficient appropriate costs to justify the FY 1993 price and that plaintiffs have failed to prove that they suffered any damages. "The utilities are consistently unreliable heralds on the issue of damages." Def.'s Br. filed Mar. 17, 2003, at 10.

For the reasons to be discussed, defendant has the better argument. The record developed at the 2001 trial is amenable to rendering findings on the subject of the remand; defendant is steadfast that it made its case during trial and that the record should not be reopened; and defendant has demonstrated that plaintiffs failed to prove their case at trial.

## FACTS AND DISCUSSION

*Florida Power III* litigated plaintiffs' challenges to the following cost components of the FY 1993 price: remedial action costs, disposal of depleted uranium, imputed interest on the Gas Centrifuge Enrichment Project (the "GCEP"), and costs relating to High Assay Uranium. The court ruled in plaintiffs' favor with respect to the first two components, but excluded the latter two as untimely. *Florida Power III*, 49 Fed.Cl. at 662–67. For purposes of defendant's motion for judgment on the record, defendant assumes that recovery of imputed interest on the GCEP would not be properly recoverable. Def's Br. filed Jan. 24, 2003, at 22. Defendant also does not contend that high assay uranium costs are recoverable. *Id.; see Florida Power III*, 49 Fed.Cl. at 667.

In *Florida Power III*, this court erred by finding that DOE's cost recovery analysis limited DOE to the costs that it included in its pricing analysis. To remedy that error, this court makes findings as to "whether the total amount of the appropriate government costs that could properly be considered in setting the price for Fiscal Year 1993 would justify [the ceiling price], and if a lower price

would have been required, how much lower that price would have been." *Florida Power IV,* 307 F.3d at 1369.

Judy C. Fulner, Financial Analyst with DOE during the transition period, was a straightforward, impressive witness. She tracked profit and loss in the financial statements of the UEA and provided information, including write-offs, to Howard Huie, General Engineer, DOE. Mr. Huie performed the pricing analysis for FY 1993, but was neither straightforward nor impressive in his testimony. Whatever frailties inhered in Mr. Huie's testimony were offset by that of Ms. Fulner, who was fully knowledgeable about the UEA pricing policy.

The FY 1991 financial statements wrote off $1.14 billion in high assay uranium costs, less $394 million that had been excluded as inventory. The cost-recovery analysis for FY 1993 did not indicate any costs for High Assay Uranium. *See* Transcript of Proceedings, *Florida Power & Light Co. v. United States,* No. 96–644C, at 1109, 1110 (Fed. Cl. Apr. 23–27, May 7 & 9, 2001) ("Tr.I").

Ms. Fulner explained that the FY 1990 UEA Annual Report showed a cumulative loss of $6.711 billion as of September 30, 1990. Tr. I at 1111. Excluding write-offs for the GCEP and the gaseous diffusion plants, the total loss amounted to approximately $2.6 billion. *Id.* at 1114. Ms. Fulner then explained the figures in the report entitled "Uranium Enrichment—9 Months Ended June 30, 1993" (the "1993 Annual Report"). This report, which covered the transition period, reflected a cumulative loss, as of June 30, 1993, of $6.28 billion, which included $1.147 billion for ceasing operations. *Id.* at 1115, 1117. As with the costs from FY 1990, amounts associated with the GCEP ($2.934 billion) and the gaseous diffusion plants ($1.2 billion) would not be recovered from utility customers. *Id.* at 1116. Once these costs were removed, Ms. Fulner then explained that an additional $1.147 billion was deducted from the cumulative loss figure, as costs of ceasing operations were not recoverable. *Id.* at 1117. Therefore, the total amount to be recovered from UEA customers was approximately $1 billion.

Ms. Fulner then added $450 million to the $1 billion figure, representing financial adjustments for cumulative profit on uranium sales, depreciation, and various costs associated with the high assay operation in general. Tr. I at 1125–27. Included in the total $1.45 billion was approximately $600.5 million associated with remedial action, which Ms. Fulner deducted, to yield a loss of $845 million to be recovered from UEA commercial customers. *Id.* at 1130. Because this amount includes imputed interest on the GCEP worth $773 million, the unrecovered net loss, deducting the four cost categories that plaintiffs challenged, totaled approximately $70 million. *Id.* at 1130–31.

Although the 1993 Annual Report was not used in April 1992 to set the FY 1993 price, and although Ms. Fulner did not set that price, this exhibit documented the costs borne by the UEA during FY 1993 up to the date that the enrichment activity, not the program losses, was transferred to EPACT. EPACT created the United States Enrichment Corporation (the "USEC") as a for-profit successor entity of the UEA. Sale of and dividends on USEC's capital stock were intended to recover losses from UEA's operations, but, in practice, the USEC recovered these losses "independent of historical cumulative losses recorded by uranium enrichment activity." 1993 Annual Report, at 16 n. 10.

Plaintiffs marshal four arguments against defendant's position that it has proved that DOE was left with unrecovered cumulative losses as of June 30, 1993. First, they argue that the mandate requires reopening the record for their proofs. The Federal Circuit's directive cannot be tortured into supporting this proposition. The appeals court stated that the record was to be reopened if defendant relied on the challenged imputed interest and high assay uranium costs to justify a price of $125.00 per SWU. *See Florida Power IV,* 307 F.3d at 1370. Only if this court were to find that DOE did so, "and if [the court] rejects the government's argument as to the appropriateness of those costs in whole or part . . . ," was the court instructed to "decide in the exercise of its discretion" whether to develop the record further. *Id.*

According to plaintiffs, DOE's $70 million cumulative unrecovered loss comes from defendant's legerdemain with DOE's financial statements. Avram S. Tucker, plaintiffs' expert cost analyst, examined all financial records of the UEA and, based on that examination, identified four categories of costs that should not have been included in the cost recovery analysis, *i.e.*, costs that were not "appropriate costs." *See* Tr. III at 36 (plaintiffs' counsel states that Mr. Tucker was to determine if a cost was "inappropriate"). Defendant elicited testimony from Mr. Tucker that these four cost categories were the only costs challenged. *See* Tr. I at 989–92. Two of the four were the basis of the court's award to plaintiffs; the other two were tried, but excluded as untimely. Plaintiffs' argument that the mandate calls for reopening the record to enable plaintiffs to discover more suspect cost categories is unavailing in light of Mr. Tucker's testimony. Although plaintiffs speculate that impugnable costs dot the landscape, when plaintiffs developed their case for trial, unfettered by any constraints, Mr. Tucker identified only four cost categories to challenge as inappropriate. Defendant reminds that plaintiffs could have identified other costs before defendant moved for summary judgment, but did not do so. Thus, the court's order on summary judgment of March 22, 2001, which allowed trial to proceed on challenges to the four cost components, did not constrain the development of plaintiffs' case.

Plaintiffs point out that the 1993 Annual Report was issued in 1994, well after DOE set the FY 1993 price and after the end of FY 1993. Plaintiffs therefore could not be expected to divine the costs that defendant now cites as yielding net unrecovered cumulative losses. The category totaling $1.147 billion for "Costs from Ceasing Operations," 1993 Annual Report at 17, is particularly suspect, according to plaintiffs. Its elements are buried in the Notes to Financial Statements of the 1993 Annual Report, are mere accounting issues, and were included in the FY 1993 price. Moreover, plaintiffs claim that neither Ms. Fulner nor any other witness testified as to the appropriateness of the costs of ceasing operations. However, under persistent cross-examination, Mr. Tucker ac-

knowledged, albeit begrudgingly, that the elements of costs for ceasing operations were costs of the UEA. Tr. I at 1058–60.

Next, plaintiffs complain that defendant is arguing that, as long as DOE can show a cumulative loss as of June 30, 1993, plaintiffs have suffered no damages. Plaintiffs contend that they challenged only the costs that were included in the FY 1993 price, not costs raised only in Ms. Fulner's testimony as a large cumulative loss to be recovered. Plaintiffs explain that they could not have been prepared to try defendant's case because "[t]hat wasn't our case" at trial. *Id.* at 36; *see also id.* at 44 ("I just didn't believe throughout it was a serious argument."); *id.* at 58 ("[Costs of ceasing operations were] not part of the price that we were challenging. The price we were challenging had a whole bunch of complements, none of which included this because these numbers weren't even put together [until] after the period in question, which we were challenging."); Tr. II at 27 ("I just didn't believe throughout [that] it was a serious argument."); *id.* at 36–37 ("We did not spend many pages on this issue in the [appellate] brief because we did not believe it was particularly serious. We were wrong, obviously . . . .").

Contrary to plaintiffs' argument, they were aware of defendant's theory of the case before trial and objected to it. *See, e.g.*, Pls.' Br. filed Feb. 26, 2001, at 3, 15, 21. Plaintiffs' regret that they did not take defendant's theory seriously does not warrant reopening the proceedings.

Third, plaintiffs interpret the Federal Circuit's opinion to task defendant with justifying the appropriateness of DOE's costs. Defendant colorfully responds:

> Plaintiffs did not contest the appropriateness of these costs at trial or dispute the Government's evidence. *E.g.*, [Tr. I] at 991–92; 1058–61. Now, however, they assert that the costs "were not incurred in connection with items used to provide then-current customers with uranium enrichment services, but were incurred to prepare the enrichment program for transfer to a separate corporation as required by EPAct. For this reason, it would not

have been appropriate" to recover them from the utilities. Plaintiffs' Response at 32. Plaintiffs' new argument is bilge.

Def.'s Br. filed Mar. 17, 2003, at 11.

Plaintiffs confuse DOE's obligation to recognize costs when it ceased operations with DOE's obligation to set a price that recovered its appropriate costs. The record developed at trial showed that costs associated with ceasing operations were DOE's to bear as of June 30, 1993. *See* Tr. I at 1118–24. Therefore, it was not unforeseeable that at the end of the transition period DOE would have costs that had not been recovered through prior years' prices. Post-retirement benefits other than pensions, for example, were one such cost. Tr. I at 1118–19. Plaintiffs elected not to present evidence that contradicted Ms. Fulner's testimony because, as stated above, plaintiffs' theory of the case, which this court adopted, was to challenge only cost elements included in the FY 1993 price.

Finally, plaintiffs contend that this court foreclosed them from eliciting testimony during trial on the subject of these costs. Plaintiffs are correct insofar as the court did not allow them to challenge any costs during trial that were not identified before trial. Mr. Tucker, plaintiffs' expert, knew about the costs incurred well in advance of trial, yet, under examination by defense counsel, he stated that he had identified four—and only four—cost categories that were not appropriate. Tr. I at 989–92. In any event, plaintiffs elected not to appeal the rulings excluding this evidence. They cannot now introduce evidence on this issue because it was within

the scope of the appeal and therefore has been waived.

Plaintiffs run foursquare into Circuit law on the scope of the mandate. In *Tronzo v. Biomet, Inc.*, 236 F.3d 1342 (Fed.Cir.2001), the court addressed the scope of remand after an earlier appeal. The Federal Circuit directed the district court to determine "if there was any evidence on the record" to support the vacated portion of a damages award and, if not, the district court was "to decide, at its discretion whether it would be appropriate to take new evidence." *Id.* at 1345. In the proceedings on remand, the district court refused to reopen the record, citing appellant's strategic decisions concerning what evidence and arguments he presented at trial to support his damages theory. The Federal Circuit upheld the district court's refusal "to address a new theory presented for the first time on remand." *Id.* at 1347. In the case at bar, defendant has advanced a consistent theory of the case since filing its motion for summary judgment in 2001. Plaintiffs, on the other hand, have interjected new theories of recovery at various points since this judge received the case on September 29, 2000.

Appellant in *Tronzo,* however, was successful in arguing against the district court's reduction of a punitive damages award after that court lowered the award of compensatory damages.[6] Appellee, just as plaintiffs in this case, attempted to revive the issue on remand. Because appellee had not appealed the award of punitive damages, the challenge was deemed waived as an issue within the scope of the initial judgment of the district

---

**6.** Indeed, plaintiffs' argument in the case at bar mirrors appellee's in *Tronzo,* and defendant's, appellant's, as shown by the following:

> Dr. Tronzo argues legal error in the district court's reduction of the punitive damages award from $ 20,000,000 to $ 52,000. Dr. Tronzo asserts that, because Biomet never challenged the punitive damages award on appeal in *Tronzo I,* it necessarily waived any right to challenge this award on remand, and the initial *punitive damages* award became the "law of the case." Alternatively, Dr. Tronzo argues that the district court's reduction of the punitive damages award was outside the scope of our remand in *Tronzo I* and, therefore, revisiting this issue was prohibited by the mandate rule.

> In response, Biomet asserts that it did not waive its constitutional challenge to the punitive damages and that neither the law of the case nor the mandate rule prevented the district court from revisiting this issue. By appealing the liability for the compensatory damages, Biomet argues, it implicitly challenged its liability for punitive damages as well. Biomet further argues that the doctrine of law of the case and the mandate rule do not preclude Biomet from asserting issues that only became ripe on remand. Because the disparity in compensatory and punitive damages first arose on remand when the district court reduced the compensatory damages, Biomet argues this issue was never waived.

> 236 F.3d at 1347.

court. In the instant case, the trial court considered not only the issue of challenged costs, but also the costs that were ultimately excluded, a ruling that plaintiffs cross-appealed.

The Federal Circuit in *Tronzo* advised that the mandate rule was not "unassailable," if "exceptional" circumstances were present. 236. F.3d at 1349. "[A] substantial change in the evidence" was identified as such a rarity. *Id.* Plaintiffs in the case under consideration cannot point to any evidence of this nature, because none was adduced once defendant showed that the record sustained its position that plaintiffs had ample opportunity to develop any such evidence before trial.

The court acknowledges the *bona fides* of plaintiffs' arguments. After all, this court was persuaded that the FY 1993 price was a serious matter that DOE had the opportunity to justify once only in its cost analysis. In *Florida Power III*, the opinion issued after the 2001 trial, this court commented on the credibility of Eugene C. Schmidt, Acting Deputy Assistant Secretary for Planning, Policy, and Budget, DOE, who established that once EPACT was enacted, DOE had no obligation to repeat its 1992 cost analysis, upon which the prices for FY 1993 were based. 49 Fed.Cl. at 668. Mr. Schmidt was convincing that DOE did not add costs to its price that could not be justified: "[T]he last thing I was looking for was to make up costs to put in. I mean, the pressures were just the opposite on me. I only put them in under duress." Tr. I at 844–45.

Plaintiffs' argument for reopening the record must be read in light of this court's ruling against the Government that was rejected on appeal. In *Florida Power III*, this court prevented defendant from arguing that DOE could replenish the cost recovery analysis once plaintiffs had jettisoned deficiencies from it. The significance of the Federal Circuit's ruling in *Florida Power IV* is that, while the ceiling price reflects cost recovery over a reasonable period of time, the analysis used to formulate that price does not signify anything more than an exercise to validate it. As of June 30, 1993, DOE was left with UEA program costs that exceeded the aggregate amount of plaintiffs' challenged costs, including those that the court excluded as untimely[7] and those that plaintiffs could have challenged. Thus, plaintiffs cannot prove that the FY 1993 price did not comport with the statutory directive to recover appropriate costs over a reasonable period of time.

## CONCLUSION

Defendant has proved by a preponderance of the evidence that DOE had a cumulative loss that could not be recovered in the FY 1993 price during the closing months of the UEA. Plaintiffs have not proved that the FY 1993 price would have been lower if all of the cost components that they challenged would have been excluded. Accordingly,

The Clerk of the Court shall enter judgment for defendant.

**IT IS SO ORDERED.**